# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                  No. 1:18-cr-01966-JCH

NICK L. MEDEIROS and
BOBBY GREAVES,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on: (i) Defendants Nick L. Medeiros and Bobby Greaves' Motion to Exclude Testimony by Jim Sechrist (ECF No. 94), (ii) the United States' Motion to Exclude Irrelevant Witnesses, or in the Alternative for a *Daubert* Hearing (ECF No. 96), and (iii) Defendants' Motion to Exclude Testimony by John Klein and Ben Ward (ECF No. 100). The Court held an evidentiary hearing on the motions on February 2 – 3, 2021. After considering the motions, evidence, pleadings, and relevant law, the Court concludes that the motion to exclude the expert testimony of James Sechrist is **granted,** but the Court **reserves ruling** on the admissibility of Mr. Sechrist's lay testimony. All other *Daubert* motions to exclude expert witness testimony are **denied** but subject to limitations placed on certain testimony.

## I.      BACKGROUND[1]

---

[1]     The background facts are taken from the superseding indictment and therefore largely reflect the Government's version of events. The Court does not set forth these facts as findings or the truth. The Court recognizes that Defendants are presumed innocent.

Nick L. Medeiros and Bobby Greaves are brothers-in-law. They partially own NJM, Inc. (NJM), a construction business established in 2012.

Mr. Medeiros is a service-disabled veteran (SDV). He allegedly exploited that status to gain preferential construction contracts set aside for military veterans under the Service-Disabled Veteran-Owned Small Business Program (SDVOSB) by giving subcontracting work to another construction business called JSR, Inc. (JSR), which is owned by Defendant Bobby Greaves and his wife.

As a result of Mr. Medeiros' SDV status, NJM allegedly applied for and received over 3.2 million dollars of federal government construction contracts between 2012 and 2016 that are reserved for SDVOSBs. In obtaining these contracts, Defendants allegedly "misrepresent[ed] the relationship" between NJM and JSR. Superseding Indictment ¶ 21, ECF No. 66. Mr. Medeiros "pass[ed] off" JSR employees as NJM employees, and, further, "conceal[ed] NJM's inability to provide sufficient employees and supervisors to complete contracts without JSR's assistance." *Id*. ¶¶ 21, 22(c). Defendants supposedly submitted contracting documents stating that NJM could perform significant work without using JSR employees or equipment when, in fact, NJM used JSR employees and equipment to perform contract work. NJM would also alter JSR employees' resumes to list them as NJM employees and dress them in NJM-emblazoned work gear.

The overt acts section of the superseding indictment for Count I (conspiracy) particularizes these allegations. In 2012, for instance, Defendants signed a "teaming agreement" as part of their successful bid for a $582,507 contract to build a weapons cleaning room at Cannon Air Force Base (the Cleaning Room Contract). *Id*. ¶ 23. Mr. Medeiros signed the agreement as the prime contractor. Mr. Greaves signed it as the subcontractor. The teaming agreement stipulated that NJM was responsible for all management and supervisory functions

and would provide an in-house project manager, contract administrator, quality control, safety manager and superintendent. Mr. Medeiros represented that "JR" and "JS" would be the project manager and superintendent, respectively. *Id*. ¶ 24. He also tendered the resume of "RR" as the quality control and safety officer on the contract. *Id*. ¶ 25.

Despite these representations, NJM allegedly had no employees in New Mexico. Furthermore, JR and JS were employees of JSR, not NJM. As for RR, his resume stated that he was an NJM employee since 2011 (before NJM was even established), when RR was actually an employee of JSR. When interviewed, RR did not know who altered his resume.

On July 18, 2013, Defendants again successfully bid on a 1.9-million-dollar contract to build the Drop Zone/Cyber Cáfe at Cannon Air Force Base (the Drop Zone Contract). Their proposed teaming agreement listed Mr. Medeiros as the prime contractor, Mr. Greaves as the subcontractor, and stipulated that NJM would be responsible for all contract management and supervisory functions.[2] Mr. Medeiros represented to contracting officials that "JS" would be the Drop Zone Contract superintendent, when in fact JS was allegedly a JSR worker. *Id*. ¶ 29. Defendants also allegedly emphasized their separateness in an August 14, 2014 email to a Department of Veteran Affairs (VA) contracting official, stating: "We are located on the same property but do not share facilities, equipment or employees … NJM, Inc. firmly stands alone and is NOT dependent on any other entity for its success." *Id*. ¶ 30.[3]

---

[2]    The alleged false representations in the July 18, 2013 bid and teaming agreement are the basis for Count III, which charges Defendants with falsely "represent[ing] to the [Air Force] that NJM would provide manager, contract administrator, quality control, safety manager, and superintendent for [the Drop Zone Contract], knowing then and there that statement to be untrue." Superseding Indictment at 10.

[3]    The alleged false representations in the August 14, 2014 email forms the basis for Count IV, which charges Defendants with falsely "represent[ing] to the VA that NJM and JSR do not share facilities, equipment, or employees, knowing then and there that statement to be untrue." Superseding Indictment at 10.

## II.     PROCEDURAL BACKGROUND

In 2016, Jim Sechrist, whom the Government refers to as a "whistleblower," told federal agencies about Defendants' alleged abuse of the SDVOSB system. His complaint was the genesis of this federal criminal proceeding.

Defendants were indicted in 2018. The indictment was superseded in March 2020. The superseding indictment charges Defendants with conspiracy to commit: fraud, major fraud and wire fraud against the government, and to make materially false statements and representations in order to influence a decision of an Executive Branch agency, all in violation of 18 U.S.C. § 371 (Count I); commission of major fraud against the government by means of false and fraudulent pretenses to obtain a Department of Defense contract valued at $1 million or more in violation of 18 U.S.C. §§ 1031 & 2(a) (Count II); and making materially false, fictitious, and fraudulent statements and misrepresentations to the government on certain dates in violation of 18 U.S.C. § 1001(a) (Counts III-IV).

On March 17, 2020, the Government filed a notice of intent (ECF No. 70) to call three expert witnesses at trial:

1. John Klein, an attorney with the Small Business Administration (SBA),

2. Benjamin Ward, the VA's chief compliance officer of the SDVOSB program, and

3. Jim Sechrist, a former government procurement officer and the alleged whistleblower whose complaint motivated the VA to investigate Defendants' SDVOSB compliance.

On October 6, 2020, Defendants filed a notice of intent (ECF No. 92) to call four expert witnesses at trial:

1. John Dulske, a private attorney in Texas experienced in government contracts,

2. J. Leo Muñoz, a certified public accountant in Texas,

3. Elizabeth Connally, a private attorney in Texas experienced in government contracts and Mr. Medeiros' former lawyer, and

4. Kelly Foster, a private attorney who previously represented JSR. Ms. Foster also represented NJM during NJM's establishment.

Throughout 2020, each side moved to exclude the other party's witnesses, arguing that the proposed testimony does not meet the Fed. R. Evid. 702 standards for admissibility as set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). The Court held a *Daubert* hearing outside of the jury's presence on February 2 – 3, 2021, during which all seven proposed expert witnesses testified. Following the hearing, the parties submitted proposed findings of fact and conclusions of law, *see* ECF Nos. 121, 122, 123, which the Court has considered in rendering its conclusions.

### III.    LEGAL STANDARDS

Federal Rule of Evidence 702 permits expert testimony when the witness "is qualified as an expert by knowledge, skill, experience, training, or education" and four factors are met: (1) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

"In evaluating the admissibility of expert testimony, 'the district court must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *Schulenberg v. BNSF Ry. Co.*, 911 F.3d 1276, 1282 (10th Cir. 2018) (quoting *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (en banc)). This requires a two-step process. *103 Investors I, L.P. v. Square D Co.*, 470

F.3d 985, 990 (10th Cir. 2006). "First, the district court must determine whether the expert is qualified by knowledge, skill, experience, training, or education to render an opinion." *Schulenberg*, 911 F.3d at 1282 (quotation marks omitted). "Second, if the expert is sufficiently qualified, the district court must determine whether the expert's opinion is reliable by assessing the underlying reasoning and methodology." *Id.* (quotation marks omitted). The proponent of the expert bears the burden by a preponderance of the evidence to establish that the requirements for admissibility have been met. *Nacchio*, 555 F.3d at 1251.

Concerning reliability, the district court must "determine whether the expert's opinions are supported by sound reasoning and methodology." *Delsa Brooke Sanderson v. Wyo. Highway Patrol*, 976 F.3d 1164, 1172 (10th Cir. 2020) (citing *F & H Coatings, LLC v. Acosta*, 900 F.3d 1214, 1222 (10th Cir. 2018)). Expert testimony must have "a reliable basis in the knowledge and experience of [the expert's] discipline," *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999) (quoting *Daubert,* 509 U.S. at 592)), and be "based on actual knowledge, not 'subjective belief or unsupported speculation.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003) (quoting *Daubert*, 509 U.S. at 590)).

A court should consider the following non-exhaustive and non-dispositive factors in determining whether particular expert scientific testimony is reliable: whether the expert's technique or theory can and has been tested; the theory has been subject to peer review and publication; the known or potential rate of error of the technique or theory when applied; the existence and maintenance of standards and controls; and the general acceptance of the methodology in the relevant scientific community. *Kumho*, 526 U.S. 137, 149-50; *103 Investors I, L.P.*, 470 F.3d at 990. The court's focus must be solely on the proposed expert's principles and methodology, not on the conclusions they generate. *Daubert*, 509 U.S. at 595.

"The relevance inquiry encompasses Rule 702's requirement that the evidence '[help] the trier of fact to understand the evidence or to determine a fact in issue.'" *Delsa*, 976 F.3d at 1172 (quoting *Daubert*, 509 U.S. at 591). Relevance is also referred to as helpfulness. *Id*. To determine whether expert testimony will help the trier of fact, courts look to "whether the testimony is relevant," "within the juror's common knowledge and experience," and "whether it will usurp the juror's role of evaluating a witness's credibility." *United States v. Archuleta*, 737 F.3d 1287, 1296 (10th Cir. 2013) (citation and quotation marks omitted). "[T]he 'assist' requirement is satisfied where expert testimony advances the trier of fact's understanding to any degree." *Id*. at 1297 (citation omitted). "[C]ourts must conduct a common-sense inquiry into whether a juror would be able to understand certain evidence without specialized knowledge." *United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1136 (10th Cir. 2014) (citation and quotation marks omitted). "Doubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Id*.

"The rules of evidence allow an expert to opine on an 'ultimate issue' to be decided by the trier of fact." *United States v. Schneider*, 704 F.3d 1287, 1293 (10th Cir. 2013) (citing Fed. R. Evid. 704(a)). Although an expert may not give an impermissible legal conclusion, an expert may give testimony that embraces an ultimate issue so long as the expert's testimony assists, rather than supplants, the jury's judgment. *United States v. Richter*, 796 F.3d 1173, 1195 (10th Cir. 2015). Expert "[w]itnesses are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions." *United States v. Bishop*, 926 F.3d 621, 632 & n.11 (10th Cir. 2019) (holding that Alcohol, Tobacco and Firearm agent could permissibly testify as an expert that a homemade device met the statutory definition

of a "machinegun" because the agent "thoroughly explained the factual basis for his opinion" which was based on "his examination and testing of the [device]").

Federal Rule of Evidence 704(b) creates an exception to rule permitting expert testimony embracing the ultimate issue, providing that, "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). "Rule 704(b) only prevents experts from expressly stating the final conclusion or inference as to a defendant's mental state. The rule does not prevent the expert from testifying to facts or opinions from which the jury could conclude or infer the defendant had the requisite mental state." *United States v. Goodman*, 633 F.3d 963, 970 (10th Cir. 2011) (citation and quotation marks omitted). That is to say, "Rule 704(b) commands the expert to be silent" concerning "the last step in the inferential process—a conclusion as to the defendant's actual mental state." *Id*. (citation and quotation marks omitted).

Although the court is required to conduct a *Daubert* examination of all experts before it, it need only expressly address the specific objections before it. *United States v. Avitia-Guillen*, 680 F.3d 1253, 1259 (10th Cir. 2012) ("When a party fails to object to an expert's methodology, the district court need not make explicit findings.") (citing *United States v. Velarde*, 214 F.3d 1204, 1209 n.3 (10th Cir. 2000) (noting that the defendant did not challenge the doctor's "credentials, expertise, or qualifications to testify as an expert")); *Macsenti v. Becker*, 237 F.3d 1223, 1233 (10th Cir. 2001) (specific findings on the record only required on party's objection); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 n.2 (10th Cir. 2000) (when no objection is raised, district courts are not required to make "explicit on-the-record rulings" and,

"we assume that the district court consistently and continually performed a trustworthiness analysis sub silentio of all evidence introduced at trial.").

Finally, Fed. R. Evid. 403 permits a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## IV. DISCUSSION

### a) Expert Testimony Analysis

#### 1. Mr. Muñoz

Defendants proffer the testimony of Mr. Muñoz, a certified public accountant who audited JSR and NJM's books. Mr. Muñoz provides forensic accounting services "relate[d] to … allegations of fraud, corporate fraud, financial fraud, assisting clients who are under investigation … qualifying loss, reviewing books and records that are under suspicion," and other services. Feb. 3, 2021 Tr. 71:23- 72:2, ECF No 120. The Government does not challenge Mr. Muñoz's qualifications to render an expert accounting opinion. Instead, the Government claims that Mr. Muñoz's opinions fail to meet the requirements under Fed. R. Evid. 401, 402, and 403, or, alternatively, states that his methodology under Fed. R. Evid. 702 should be examined. Having conducted that examination, the Court concludes that Mr. Muñoz's accounting opinions are supported by sufficient facts and data and that his testimony would assist the trier of fact.

In October 2020, Mr. Muñoz tendered an expert report in which he offered three main conclusions.

First, Mr. Muñoz opined that "NJM's initial start-up capital was provided by family members using allowable means under IRS regulations regarding tax-free gifts between

individuals, in NJM's case, family members," ECF No. 92 at 22, and that "[a]s shareholders of JSR, Bobby and Nancy Greaves were entitled to tax-free cash distributions deposited into their personal bank from JSR's net profits." *Id*. at 16.

Mr. Muñoz explained that in March 2012, JSR personally paid Bobby and his wife Nancy Greaves a shareholder cash distribution of $110,000 that was part of a $1 million shareholder cash distribution for that fiscal year. In April 2012, Mr. Greaves and his wife individually gifted $13,000 to Mr. Medeiros (for a total of $26,000), and individually gifted $12,245 to Mr. Medeiros' wife, Janice ($24,490 total to Janice).

Janice and Nick Medeiros returned the gifts backs to the Greaves – all told $50,490 – by issuing them checks in the same amounts received. Money in hand, Mr. Greaves and his wife then repeated this process by gifting separate checks to Janice Medeiros' parents, Joe and Madeleine Felan. The Felans then gifted Nick and Janice Medeiros $50,490 through individual checks through their personal bank accounts. Two weeks later, Mr. Medeiros wrote a check from his personal bank account to NJM for $50,490 as his shareholder initial capital contribution.

After analyzing these transactions, Mr. Muñoz concluded that that the Greaves-Medeiros-Felans transactions fell under the gift tax exclusions (which in 2012 was $13,000 per person and $26,000 for married couples) and were not reportable to the IRS. Mr. Muñoz believes that non-reportable gifts of this kind are common methods to generate start-up capital for small businesses. As for JSR's shareholder distributions, Mr. Muñoz explained that Bobby and Nancy Greaves were entitled to tax-free cash distributions deposited into their personal bank account. So, in Mr. Muñoz's opinion, the Greaves's use of the $110,000 distribution was discretionary, and thus could have included "mak[ing] an unlimited amount of tax-free gifts to anybody … or mak[ing] an investment in another company." *Id*. at 17.

The Court concludes that sufficient facts and data support Mr. Muñoz's conclusion about NJM's capitalization and JSR's shareholder distributions. In addition to relying on his discussion with Defendants, their lawyers, and an Air Force investigative report, Mr. Muñoz also considered NJM and JSR's annual audited financial statements for fiscal years 2012-2018, NJM's tax returns and its books. Mr. Muñoz also spoke with NJM's auditor and Mr. Muñoz referenced IRS rules. Thus, Mr. Muñoz's opinions are based on his examination of financial documents, knowledge of IRS rules, and interviews with individuals. Perceived deficiencies that the Government highlights, such as Mr. Muñoz's knowledge, or lack thereof, of the unconditional nature of the gifts, go to the weight of his testimony rather than its admissibility.

The heart of the Government's challenge is that Mr. Muñoz's opinions concerning capitalization and shareholder distributions are irrelevant. It claims that Defendants' alleged "shuffling of personal money through several intermediaries," even if allowed under IRS rules, would not undermine the materiality of their alleged false statements that NJM "stands on its own and does not rely on JSR … for [NJM's] existence in the first instance, through its start-up capital coming exclusively from JSR[.]" ECF No. 96, 4. To be relevant, Mr. Muñoz's testimony must have "any tendency to make a fact more or less probable than it would be without the evidence" and the fact must be "of consequence in determining the action." Fed. R. Evid. 401. "In other words, relevant evidence tends to make a necessary element of an offense more or less probable." *United States v. Williams*, 934 F.3d 1122, 1131 (10th Cir. 2019) (citation omitted).

The Defendants have put forward many arguments for why Mr. Muñoz's opinions concerning "the source, character, and nature of NJM's startup capital," and JSR's shareholder distributions undermines their participation in the alleged conspiracy, *see* ECF No. 125 at 15, 23,

24, 26, and their intent to commit major fraud, *see id.* at 21, 27.[4] Mindful of the "low threshold for relevancy," *United States v. Ganadonegro*, 854 F. Supp. 2d 1088, 1127 (D.N.M. 2012), the Court concludes that Mr. Muñoz's opinions regarding NJM's capitalization and JSR's shareholder distributions are relevant because they tend to cast doubt on Defendants' alleged participation in the conspiracy and their intention to commit fraud and therefore will be admissible. The Court also concludes that the proffered testimony is not within a juror's common knowledge and that his testimony does not risk usurping the jury's role of evaluating a witness's credibility.

Mr. Muñoz's second opinion is that "NJM and JSR's business, operation and financial practices with respect to their oral[ ] … employee leasing agreement are comparable to the attributes of a traditional employee leasing agreement between organizations engaged in this type of practice." ECF No. 92 at 22. According to Mr. Muñoz, NJM and JSR's oral employee leasing agreement has all the hallmarks of a traditional employee leasing agreement. Those hallmarks are: JSR is the official employer for employees leased to NJM; Mr. Medeiros and NJM have management control responsibilities over leased JSR employees; JSR reports wages and employment taxes to the IRS and does payroll; NJM pays JSR an employee leasing fee that covers the cost of payroll and payroll taxes, and; JSR manages compliance with state and federal payroll reporting requirements, including W-2s. Mr. Muñoz also opined that NJM did not share employees, facilities, or equipment with JSR because JSR was paid for its services.

Mr. Muñoz's third opinion is that, based on his detailed audit, NJM performed a "signification amount of work (15%) on the contracts identified in the [superseding] indictment." *Id*. at 2. He stated that JSR tracked its leased employees' name and time spent at a given NJM

---

[4]     The Court's reference is to the page numbers, rather than paragraph numbers, of Defendants' proposed conclusions of law.

construction project and periodically invoiced NJM for those services. After conducting his own audit of NJM and JSR's business documents, Mr. Muñoz generated a chart showing that "[e]mployee leasing participation provided by JSR to NJM, from a cost perspective, never exceeded 15 percent of total individual project cost." *Id.* at 20. Mr. Muñoz also looked at the average hourly billing rate of JSR workers and noted "no unusual high billing … charged by JSR to NJM under its oral leasing agreement." *Id*

The Court concludes that the procedures underlying Mr. Muñoz's second and third opinions are reliable. In addition to relying on the "summary of sources considered" in his expert report, Mr. Muñoz interviewed Mr. Medeiros and JSR's chief financial officer. He "analyzed NJM/JSR's business, operational and financial practices … by comparing the NJM/JSR arrangement" with an example traditional employee leasing agreement found on publicly available website, www.entrepreneur.com/encyclopedia/leased-employees. *Id*. at 18. Mr. Muñoz's opinion about Defendants' alleged employee leasing agreement is therefore grounded in his review of source material, interviews, and a publicly accessible website. Concerning his audit of JSR's accounting process, Mr. Muñoz's report details the steps he took to perform his audit, and his audit is therefore based on a methodology. Perceived defects that the Government highlights, such as Mr. Muñoz's unawareness of a written lease agreement between NJM and JSR, his failure to account for JSR labor costs versus total labor costs, and that he did not independently observe Mr. Medeiros' work time, go to the weight of the testimony rather than its admissibility.

The Court also concludes that Mr. Muñoz's second and third opinions will assist the jury. The Defendants have connected their theories for the relevancy of Mr. Muñoz's testimony to each count of the superseding indictment. *See* ECF No. 123 at 15-22, 24, 26-28. Upon review of

Defendants' arguments and mindful of the low threshold admission of relevant evidence, the Court concludes that Mr. Muñoz's second and third opinions are relevant. The Court also concludes that the proffered testimony concerning the nature of an employee leasing agreement and Mr. Muñoz's accounting analysis is not within a juror's common knowledge. Moreover, his testimony does not risk usurping the jury's role of evaluating a witness's credibility.

In summary, Mr. Muñoz has the qualifications and methodology to testify as an expert at trial.

### 2. Messrs. Dulske, Klein and Ward[5]

The Government proffers Mr. John Klein and Mr. Ben Ward, both federal contracting officers, to testify as experts about their agencies contracting procedures. Mr. Klein is the SBA's associate general counsel for procurement law. Mr. Ward is the chief of risk and compliance at the VA's Center for Verification and Evaluation (CVE). Defendants proffer the testimony of John Dulke, a Texas lawyer experienced in public contracts and the federal acquisition regulations (FAR).

No party challenges Messrs. Dulske, Klein or Ward's qualifications or experience to testify as experts. Absent a challenge to the witnesses' qualifications, the Court holds that the witnesses are qualified to testify as experts. The Court next examines the reliability and relevancy of the proffered testimony.

The proposed expert testimony is reliable. All three witnesses testified extensively about the legal regime governing SDVOSBs. In addition to relying on his personal experience drafting SDVOSB regulations, Mr. Klein testified about the SBA certification process for SDVOSB

---

[5]     Because of the similarity of Messrs. Dulske, Klein and Ward's proposed testimony about the federal rules governing SDVOSBs, the Court groups together the witnesses in the Court's analysis.

contracts, the SBA's role in investigating and resolving protests by rival companies, and the various standards to qualify as an SDVOSB, including the service-disabled veteran's eligibility, ownership, and control. Mr. Ward of the VA similarly testified about the workings of the VA's SDVOSB certification process, including how the agency accepts as true the representations by the service-disabled veteran, how the VA investigates concerns about SDVOSB-status, and how companies allegedly conceal facts about their SDVOSB qualifications. Thus, the federal contracting officers' methodology in reaching their conclusions is properly grounded their extensive knowledge of government standards for qualifying as an SDVOSB and retaining that status. Moreover, "Government witnesses are permitted … to testify as to whether certain truths, if known, would have influenced their decisionmaking," *United States v. Kingston*, 971 F.2d 481, 486 (10th Cir. 1992), even when such a witness offers lay testimony as the official who reviewed the false representations that were submitted. *United States v. Matsumaru*, 244 F.3d 1092, 1102 (9th Cir. 2001); *United States v. Barile*, 286 F.3d 749, 756 (4th Cir. 2002) (allowing lay opinion of government witness to testify about "what information the witness deemed important" in Food and Drug Administration notifications that allegedly contained false statements). Mr. Klein and Mr. Ward's opinions are reliable.

John Dulske, a private lawyer experienced in federal procurement and federal contracts since 1992, likewise grounded his process in his extensive knowledge of pertinent standards. Mr. Dulske also discussed the standards like ownership and control to qualify as an SDVOSB before a business can bid on set-aside contracts, the solicitation process, and the government's encouragement of teaming agreements. In addition, as described in Defendants' notice to the Government and Mr. Dulske's testimony, Mr. Dulske referred to FAR formulas to be used in evaluating whether an SDVOSB complies with subcontracting limitations. Subcontracting

limitations for "general construction" contracts provide that "[t]he [SDVOSB] will perform at least 15 percent of the cost of the contract, not including the cost of materials, with its own employees." 48 C.F.R. § 52.219-14(c)(3). Subcontracting limitations for "special trade" contracts provide that "[t]he [SDVOSB] will perform at least 25 percent of the cost of the contract, not including the cost of materials, with its own employees." *Id*. at § 52.219-14(c)(4). Mr. Dulske opined that for nine of the eleven contracts listed in the superseding indictment Defendants complied with the FAR formula for general contracts because "NJM subcontracted less than 85% of labor costs." ECF No. 92 at 4. As for the remaining two contracts, Mr. Dulske explained the FAR formula did not apply to one, and that the second contract was never performed, rendering the formula irrelevant.

Mr. Dulske also reported that, "to [his] knowledge … [the FAR] [does not] prohibit the use of leased labor," and therefore NJM permissibly leased JSR workers. *Id*. at 5. He opined that the allegedly leased "JSR employees were properly issued NJM gear for identification purposes," at worksites, that they "work[ed] under the direct control of NJM," and that NJM and JSR's financial records corroborate the existence of a lease agreement. *Id*. Based on his review of "the voluminous contractual correspondence and interviews" with Defendants, Mr. Dulske opined that "Mr. Medeiros and his job site superintendents were the points of contact for the government's contracting officers, contracting officers' representatives, and numerous subcontractors." *Id*. at 6.

The Court concludes that sufficient facts and data support Mr. Dulske's opinions. Mr. Dulske referred to various VA, SBA, and FAR regulations and testified about extensively about control and ownership by a service-disabled veteran. Mr. Dulske has also reviewed "at least several thousand" documents from this case, and therefore his methodology is grounded in his

thorough review of the case and knowledge of pertinent regulations. Feb. 2, 2021 Tr. 219:19, ECF No. 119.

The Government states that Mr. Dulske's opinions are unreliable because, *inter alia*, he gave no "special definition" of the terms "provide" in the context of Count III and "share" in the context of Count IV. It also claims that Mr. Dulke's opinion about the propriety of Mr. Medeiros' statement to contracting officers that an individual "works directly for" Mr. Medeiros lacks foundation. *See* ECF No. 122 at 17-18. However, the Court is unconvinced that these particular terms – "provide," "share," "works directly for" – have a "distinct and specialized meaning in the law different from that present in the vernacular," and thus testimony about these terms does not "risk[] crossing the line into unhelpful and inadmissible testimony[.]" *Richter*, 796 F.3d at 1196 (citation and quotation marks omitted). In any case, Mr. Dulske adequately explained the bases for his opinions. He described the government's bid solicitation process and stated that NJM represented to the government that it would "provide" certain workers, or that a certain worker "work[ed] directly for," Mr. Medeiros because "[t]he government wanted those positions" filled. Feb. 2, 2021 Tr. 192:10. Concerning "sharing," Mr. Dulkse's opinions again rely on a suitable foundation. He testified that NJM did not share facilities, equipment, or employees because NJM paid for those items, thereby articulating his rationale for his conclusion. At this stage, the Court's focus is not on Mr. Dulske's specific conclusion but on "the methodology employed." *Bitler v. A.O. Smith Corp.,* 400 F.3d 1227, 1233 (10th Cir. 2004). The Court concludes that Mr. Dulske's employed a suitable methodology such that his opinions are reliable.

The Court concludes that the proposed expert testimony will assist the trier of fact. For instance, Mr. Klein and Ward's testimony will contextualize their agencies' decision-making

process for awarding SDVOSB contracts. The average juror is unlikely to be aware of the specialized and complex rules governing contracting preferences for military veterans. It will aid the jury to understand the core standards to qualify as an SDVOSB and the Air Force's practice of relying on an applicant's self-certification that it meets SBA standards. It is hard to imagine how the Government could cogently present its case without the assistance of expert testimony on the SDVOSB regime. Moreover, as noted earlier, "Government witnesses are permitted … to testify as to whether certain truths, if known, would have influenced their decisionmaking," *Kingston*, 971 F.2d at 486.

As for Defendants, they appear to offer Mr. Dulske's testimony to demonstrate, *inter alia*, that certain conduct, like NJM and JSR's use of oral leases, is not itself prohibited by SDVOSB rules, and that NJM retained overall direction, control, and responsibility for the work and properly issued JSR leased employees gear. This testimony will be relevant. In addition, Mr. Dulske's testimony concerning Defendants' alleged compliance with FAR subcontracting regulations will help the jury evaluate, among other things, whether Defendants conspired to "misrepresent the relationship between NJM and JSR[.]" Superseding Indictment ¶ 21. Finally, there is no indication that the expert testimony would usurp the juror's role of evaluating a witness's credibility.

The Court next turns to whether the proffered testimony would run afoul of Rule 704(b)'s prohibition on opinion testimony "that a defendant did or did not possess the requisite mental intent at the time of the crime." *United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir. 1995). Mr. Klein and Mr. Ward properly testified about their agencies' procedures and practices and were permitted to respond to hypotheticals, even though the hypothetical questions perhaps mirrored the Defendants' alleged conduct. *See Goodman*, 633 F.3d at 970 (noting that Rule 704(b) was

not violated where prosecutors "posed hypothetical facts that mirrored the charged robberies and asked the experts whether the hypothetical robber's actions were consistent with the behavior of someone with PTSD."). In response to the prosecutor's hypothetical questions, Mr. Klein and Mr. Ward adequately "expla[ined] the criteria," *United States v. Dazey*, 403 F.3d 1147, 1171 (10th Cir. 2005), on which their opinions concerning "whether certain truths, if known, would have influenced their decisionmaking." *Kingston*, 971 F.2d at 486. Similarly, Mr. Dulkse provided an adequate foundation for his conclusion that the statements described in Counts III and IV were not material (although as explained below, there are potential problems with the witness's use of the term "material.") He sufficiently explained that the SBA and VA had already determined that NJM and JSR were unaffiliated and that Mr. Medeiros owned and controlled his company to the exclusion of JSR. No witness "testif[ied] that any particular defendant actually violated the law," *Dazey*, 403 F.3d at 1172, and thus the proffered testimony is consistent with Rule 704(b).

At trial, though, the parties must take care to not elicit legal conclusions on "materiality." The Government correctly recognizes that 18 U.S.C. § 1001 has a materiality element for the jury to determine and that a false statement is material when it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed. *See Williams*, 934 F.3d at 1128 (citation omitted). In an 18 U.S.C. § 1001 prosecution, the Fourth Circuit held that defense expert testimony that certain submissions were not "materially misleading statements" arguably constituted "a legal conclusion because materiality has a specialized legal meaning." *Barile*, 286 F.3d at 761. However, the court explained that the lawyers could ask the expert if the submissions were "reasonable" since this

more "carefully phrased" question "elicit[ed] similar information yet avoid[ed] a response that constitute[d] a mere legal conclusion." *Id*. at 760.

Here, some of the *Daubert* testimony possibly constituted the sort of "problematic question[ing]," *id*., regarding materiality. *See, e.g.*, (Feb. 2, 2021 Tr. 214:20-23, 215:8-9 (Mr. Gross: "[I]s this statement laid out in Count 3, is it material to whether or not NJM would get the contract for drop zone?" Mr. Dulkse: "[N]o. This isn't a material … statement.")); (*id*. 24:19-21 (Mr. Mysliwiec: "would [an applicant's bonding arrangement] be material to your analysis in reviewing the protest?" Mr. Klein: "Yes, that would be material.")); (*id*. 70:17-18, 20-21, 24 (Mr. Mysliwiec: "I want to ask you … about whether those things would be material to your decision and CVE's decision …." Mr. Ward: "Okay.")).)

Again, "[a]n expert may not state legal conclusions drawn by applying the law to the facts, but an expert may refer to the law in expressing his or her opinion." *Richter*, 796 F.3d at 1195 (quoting *United States v. Bedford,* 536 F.3d 1148, 1158 (10th Cir. 2008)). Thus, the parties may not ask the experts questions like, "was this a material statement?" since this question is "phrased in broad terms and uses a word with a specialized meaning." *Barile*, 286 F.3d at 761. The parties will ensure that the expert testimony "provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the … specialized knowledge within the expert's field." *Richter*, 796 F.3d at 1195; *Barile*, 286 F.3d at 760-61 (providing useful examples of admissible questions posed to experts which are "specific, do not invade the judge's province of instructing the jury regarding the meaning of specialized legal terms, and would elicit responses that give the jury insight into the bases for the expert's conclusion.")

In summary, Messrs. Dulske, Klein and Ward may testify as experts. But at trial the parties will take care not to elicit testimony that draws legal conclusions about a legal issue to be decided.

### 3. Ms. Connally

Ms. Connally, an attorney, was legal counsel to Mr. Medeiros from 2012 – 2015 and represented NJM in obtaining SDVOSB status. She also helped him obtain approval as an 8(a)-small business. She is familiar with applicable federal regulations for construction and set-aside contracts. The Government does not challenge Ms. Connally's qualifications or expertise to testify as an expert, so the Court proceeds to whether her testimony is reliable and relevant.

Ms. Connally submitted a report. In it, she explained that, based on her knowledge and experience, Mr. Medeiros is a qualified SDV. She stated that the VA approved NJM as an SDVOSB and that the SBA found no improper affiliation between JSR and NJM. Concerning the alleged oral employee leasing arrangement between NJM and JSR, she opined that such an agreement is typical in the industry and that several of NJM's successful bids "fully disclosed JSR as a teaming partner … and the scope of work" NJM and JSR would provide. ECF No. 92 at 33. She opined that the leased JSR employees performed work "under NJM's direction." *Id*. at 34. She also explained that under federal labor law, NJM was an employer of the leased JSR workers because NJM paid their wages and benefits and exercised control and supervision over the JSR workers. Finally, Ms. Connally stated that NJM complied with the FAR formula for general construction and specialty trade contracts, and that the only instances of non-compliance with the FAR formula occurred because the FAR formula did not apply.

The Court concludes that Ms. Connally's conclusions are reliable. In addition to relying on her professional experience, she arrived at her conclusions by reviewing the superseding

indictment, discovery documents, payroll documents, and the report generated by Mr. Muñoz, and thus her conclusions reflect the use of a methodology. Although the Government contends that Ms. Connally's "opinion about the meaning of the verb 'share'" in the context of Count IV "is unanchored to … methodology," ECF No. 122, 22, Ms. Connally in fact testified that NJM did not share facilities, equipment, or employees because, first, NJM paid the JSR employees' wages and second, because the JSR employees were under Mr. Medeiros' direction and control, thereby demonstrating the bases for her conclusions. Moreover, as stated earlier, the Court remains unconvinced that the term "share" has a distinct meaning in the law different from that present in the vernacular. *See Richter*, 796 F.3d at 1196.

Ms. Connally's testimony would also assist the trier of fact. On direct-examination, she testified about the SBA's "very extensive" 2015 size determination, what factors the agency reviewed, and the agency's conclusion that NJM and JSR were unaffiliated, which will assist the jury in understanding the agencies' contracting process. Feb. 3, 2021 Tr. 107:13. She also testified about the solicitation process, the teaming agreement, and her analysis of Mr. Medeiros's "active[] involve[ment] in the day-to-day transactions" based on SBA regulations. *Id*. 114:16. The Court concludes that Ms. Connally's specialized knowledge will help the jury contextualize and evaluate Defendants' alleged misrepresentations and concludes that there is no risk of her testimony usurping the jury's role of evaluating a witness's credibility.

However, Ms. Connally may not opine, as she did in her report, that "neither Mr. Medeiros nor NJM are guilty." ECF No. 92, 35. This is essentially telling the jury what verdict it should reach. Guilt or innocence is a determination for the trier of fact alone. *See Richter*, 796 F.3d at 1195 ("[R]ule [704] does not permit an expert to instruct the jury how it should rule[.]")

Nor may she give opinion testimony about materiality, as she did at the *Daubert* hearing, *see* Feb. 3 Tr. 126:17-22, for the same reasons explained earlier.

### 4. Ms. Foster

Kelly Foster is an attorney at the Gardner Law Firm in Texas. She represented JSR from 2008-11 and represented NJM during NJM's organization. In their notice to the Government, Defendants originally offered Ms. Foster's expert conclusion that "NJM was properly certified with CVE, and the teaming agreement was legal." ECF No. 92 at 8. But at the *Daubert* hearing, Mr. Medeiros orally amended the notice to reflect that Ms. Foster had "no knowledge about CVE or governmental contracting" and stated that "[h]er knowledge [was] only on the opinions she expressed … regarding the teaming agreement." Feb. 2, 2021 Tr. 144:1-5. The prosecutor agreed to "restrict … cross-examin[ation] based on that reduction in scope," and questioning proceeded on that basis. *Id.* 144:7-8. In addition, the Government does not challenge Ms. Foster's qualifications to testify as an expert about the teaming agreement. Thus, it is undisputed that Ms. Foster is qualified to testify, so the Court next recounts the specific opinions that Ms. Foster expressed regarding the teaming agreement and analyzes the reliability and relevancy of her conclusions.

Ms. Foster explained that her law firm created a teaming agreement for Mr. Medeiros to establish "a prime contractor and a subcontractor type relationship," between NJM and JSR. Feb. 2, 2021 Tr. 137:8-9. She also explained that Mr. Medeiros did not propose the language that became the basis of Count III of the superseding indictment, specifically that NJM would "provide project manager, contract administrator, quality control, safety manager, and superintendent for" construction of a Drop Zone/Cyber Cáfe at Cannon Air Force Base. Superseding Indictment at 10. Rather, Ms. Foster's law firm drew up that specific language. She

further testified that use of the word "provide" in the teaming agreement was intended to "give Mr. Medeiros, as a new business owner, … maximum flexibility to perform his obligations," and that the agreement's language could have encompassed an employee lease agreement. Feb. 2, 2021 Tr. 115:22-24.

The Court concludes that Ms. Foster's opinion about the nature and purpose of a teaming agreement is reliable. She testified that she has expertise regarding business organizations and stated that she is familiar with how "business formation documents" should "look" when submitted to government officials. *Id*. 136:22. She explained that when she analyzed a teaming agreement, she viewed it from a "purely contractual standpoint," and did not "get into the FAR" rules and regulations. *Id*. 157:4-5. Thus, Ms. Foster's opinions about the nature and purpose of a teaming agreement is based on her specialized knowledge as a lawyer and her understanding of principles of contract formation.

The Court also concludes that Ms. Foster's testimony would assist the trier of fact. While the Government may have a point the teaming agreement's facial "legal[ity] … in no way tells the jury whether it's any … less likely that Nick Medeiros made other material misrepresentations," Feb. 2, 2021 Tr. 149:7-10, it would aid the jury's mission if it knew that the representation in the teaming agreement, which is the basis of Count III, was made by Mr. Medeiros' legal team. The jury should be able to weigh this evidence against the accusation that Defendants maintained off-the-books agreements that were not disclosed to the government. The Court also concludes that the nature and purpose of teaming agreements may not be within the experience of laypersons and that Ms. Foster's testimony on such agreements does not risk usurping the jury's role in evaluating a witness's credibility.

On a different note, Defendants state that "Ms. Foster is also a fact witness regarding NJM's formation, the intent of the Defendants regarding NJM's formation, the intent of the teaming agreements between NJM and JSR, and the character of the Defendants." ECF No. 123 at 6. However, beyond this statement, the Defendants provided no legal analysis about the admissibility of Ms. Foster's testimony, much of which arguably would be based on her specialized knowledge. Without the benefit of legal briefing on whether Ms. Foster may offer lay testimony, the Court will not simply assume that she can testify as a fact witness or testify to Defendants' character. Should Defendant wish to offer Ms. Foster's lay opinion testimony, they must make a motion with supporting authorities demonstrating that her testimony is admissible.[6]

### 5. Mr. Sechrist

Mr. James Sechrist is a government retiree who provides volunteer consulting services to military veterans about procurement. He previously worked as a procurement officer for the Air Force and other federal agencies. According to the Government, Mr. Sechrist is the "whistleblower" who "first requested NJM's contracts be investigated, which they later were, leading to the present grand jury superseding indictment." ECF No. 101, 1. Mr. Sechrist investigated NJM by researching it on VetBiz, a publicly available government website which allowed Mr. Sechrist to view NJM's successful bid proposals. In addition to using VetBiz to research NJM, Mr. Sechrist also searched for NJM using other publicly available websites, such as the website of the Texas Secretary of State and Google.

---

[6]     This ruling applies equally to Ms. Connally, whom Defendants similarly wish to "testify as a fact witness regarding her knowledge of the initial denial and reconsideration and ultimate grant of NJM's SDVOSB certification by [the] VA[,] … NJM's application for SBA 8(a) certification, a 2013 size protest at GAO where NJM was an intervenor, and the character of Defendants." ECF No. 123 at 38.

In February 2016, Mr. Sechrist submitted a complaint about NJM to the CVE. That complaint is published in full as follows:

> This firm [i.e. JSR] is connected to DUN # 133308283 where the person listed below what their Manager or still is, the firm was using his service connected disability for the Veteran First Program. This firm graduated from the 8(a) program 3/13/2015 as you can see below the SBA certified the employee of JSR as 8(a) 3/23/2015 meaning the Duns# above will get '18 years' in the 8(a) beside stealing from the SDVOSB. This firm is verified in the VA Data Base VetBiz as a SDVOSB but what are new, lots are verified that aren't what they represent themselves as SDVOSB 'controlled' firms. The vendor page for the SDVOSB shows 2 employees, in 2012 to take advantage of the Veterans First program by JSR … using their employees listed as the owner of this firm. Shows the SBA isn't at the top of their game in handling the verification of firms for the SBA 8(a) program. Note there's no fax# listed the reason is their fax# … belongs to JSR. don't believe me search their SBA profile. So JSR Inc. using the SDVOSB firm has managed to steal $2,479,296.00 from the program the majority of the awards are with Air Force and the VA pretty good with 2 employees.

ECF No. 94 at 2.

The CVE referred Mr. Sechrist's complaint to the SBA because the "CVE does not opine on issues pertaining to" to the SBA. *Id*.

The Government intends to call Mr. Sechrist as a fact witness and an expert witness. As a fact witness, the Government expects Mr. Sechrist to testify about the circumstances of his investigation that led him to be a whistleblower. As a potential expert, the Government attempts to qualify Mr. Sechrist as an expert about the SDVOSB programs based on his experience working in government procurement and to testify as an expert "so that he may explain why he acted as he did" in investigating NJM; his "motivat[ion]" for filing a whistleblower complaint; and "why he is interested in compliance with SDVOSB programs and what harm he has observed resulting from manipulation of that process." ECF No. 70 at 4.

Defendants move to exclude Mr. Sechrist from testifying as either a fact or expert witness based on numerous grounds: that he lacks personal knowledge to make his statements,

that his statements exceed the bounds of lay testimony, that he is unqualified and has no reliable methodology, and that his statements are hearsay and irrelevant.

Addressing the Rule 702 issue first, the Court proceeds to *Daubert*'s second prong, reliability, since that prong prohibits Mr. Sechrist from testifying as an expert. The allegations in Mr. Sechrist's complaint do not meet the standard set forth in *Daubert* and *Kumho*. The Government attempts to cast Mr. Sechrist's methods as "simple, but reliable:" he would search VetBiz to see NJM and rival companies' bids for jobs, then he would search those companies in the secretary of state's website and search the companies on Google. ECF No. 101 at 4. However, Mr. Sechrist's statements in his CVE complaint should be excluded because they are infected with accusations lacking a reliable foundation. For instance, he stated that NJM's certification as a SDVOSB meant it could "steal" from the government, that JSR, "has managed to steal" more than 2 million dollars, and that "lots [of business] are verified that aren't what they represent themselves as SDVOSB 'controlled' firms." ECF No. 94 at 2. Even assuming, *arguendo*, Mr. Sechrist's internet research constituted a methodology of sorts, his "data" and resulting conclusions amount to nothing more than speculative opinions that no expert could reasonably rely upon.

The Government moves in the alternative to admit Mr. Sechrist's testimony as lay opinion testimony under Rule 701. "Rule 701 applies only '[i]f the witness is not testifying as an expert.'" *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (quoting Fed. R. Evid. 701). "Indeed, the rule expressly prohibits the admission of testimony as lay witness opinion if it is based on 'specialized knowledge.'" *Id.* (quoting Fed. R. Evid. 701). "In other words, a person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *Id.* (citation

and quotation marks omitted). Under Federal Rules of Evidence 602 and 701, "a witness can testify about something only if he or she has personal knowledge." *United States v. Tapaha*, 891 F.3d 900, 906 (10th Cir. 2018). "This standard is not difficult to meet." *Gutierrez de Lopez*, 761 F.3d at 1132. "A court should exclude testimony for lack of personal knowledge only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which he testifies to." *Id*. (citation and quotation marks omitted).

Based on the current record, it appears that Mr. Sechrist could not have perceived or observed the facts of his proposed testimony. His information is based on hearsay that he read online.[7] When a witness "merely has personal knowledge of an out-of-court statement offered to prove the fact asserted in that statement—but not the underlying fact—then his or her testimony must comply with the hearsay rule." *Id*. Under that rule, hearsay is generally inadmissible unless permitted by exception provided in the Federal Rules of Evidence. *Id*. at 1132-33. The obligation of establishing the applicability of a hearsay exception falls upon the proponent of the evidence. *United States v. Samaniego*, 187 F. 3d 1222, 1224 (10th Cir. 1999) (citation omitted). To the Court's knowledge, the Government identified no exception in the rules of evidence that would permit the hearsay to be admitted. It explained only that "the official public information portals are not 'hearsay' that is mysterious and unverifiable." ECF No. 101 at 4-5. However, this statement does not suffice to identify an exception to the hearsay rule. For instance, the Government does not explain whether the online material from VetBiz, the secretary of state, and

---

[7]     The Government unconvincingly argues that Mr. Sechrist is like the Coast Guard officers in *United States v. Williams*, 865 F.3d 1328, 1341-42 (11th Cir. 2017), who testified as lay witnesses that, based on their experience in drug interdictions, they observed cocaine bales being thrown into the Caribbean Sea. But the officers' opinions related to "the appearance of persons or things, ... size, weight, [and] distance," which were "prototypical examples of the type of evidence contemplated by ... Rule 701." In contrast, Mr. Sechrist's opinions appear to be based on out-of-court statements that he read online, making *Williams* distinguishable.

Google could be admitted under Fed. R. Evid. 803(6) as business records, and/or under Fed. R. Evid. 803(8) as reports of a public agency. The online records are not in the evidentiary record and cannot be evaluated and thus there is no foundation for this material to be business records or public agency reports.

Nevertheless, the Court ultimately chooses to reserve its ruling on the admissibility of Mr. Sechrist's lay witness testimony until trial so that questions of foundation can be resolved in the proper context. Defendants suggest deferring ruling too, although they do state that "[i]f Mr. Sechrist did not record the information he obtained from the websites he viewed as they existed at the time of his searches, it is unclear whether he could authentically recreate it now and have it introduced at trial without lacking personal knowledge, being cumulative of other witnesses, and hearsay." ECF No. 123 at 50. Because the Court does not wish to hinder a party's ability to present potentially admissible evidence, the Court reserves ruling on the admissibility of Mr. Sechrist's lay testimony until trial. The parties should be prepared to address the Government's *res gestae* argument concerning Mr. Sechrist's testimony, which was given little to no exposition in the briefing.

In summary, Mr. Sechrist lacks the requisite methodology to testify as an expert at trial. The Court reserves ruling on the admissibility of his lay testimony.

### *b) Rule 403 Analysis*

Each side moves to exclude the opposing witnesses' expert testimony under Rule 403 which permits a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Tenth Circuit "*favors* admission of all relevant evidence not otherwise proscribed; thus,

exclusion under this rule is an extraordinary remedy [that] should be used sparingly." *United States v. Watson*, 766 F.3d 1219, 1241 (10th Cir. 2014) (emphasis in original) (citation and quotation marks omitted); *United States v. Otuonye*, 995 F.3d 1191, 1206 (10th Cir. 2021) ("The exclusion of relevant evidence under Rule 403 is an extraordinary remedy to be used sparingly.")

The Government makes overlapping arguments that the defense expert testimony will confuse the issues, mislead the jury, and waste time. Echoing much of its relevancy arguments, the Government contends that, for example, Mr. Dulske's testimony about NJM's performance of 15% of contract work or Mr. Muñoz's testimony about IRS gift tax exclusion rules will confuse the issues and mislead the jury into believing that Defendants' alleged compliance with various rules suggests that they are innocent. Or, as the Government said in a different pleading, the "danger" is that "Defendants will seek to introduce extensive evidence of regulations and civil laws, and adduce testimony that describes how they complied with various regulations and civil laws," which will mislead the jury. ECF No. 98, 2.

Defendants are certainly not allowed to mislead or confuse the jury by suggesting that, for example, compliance with certain IRS or SDVOSB rules exculpates the Defendants. However, the Defendants are certainly allowed to put on relevant evidence. As part of its Rule 702 analysis *supra*, the Court has explained that the witnesses' testimony is relevant. Given that the central charges against Defendants stem from their alleged fraudulent misrepresentations to the government, witness testimony that contextualizes pertinent rules and regulations will help, rather than mislead the jury. The Court trusts that the jurors will intelligently distinguish between Defendants' alleged compliance with pertinent civil regulations and their alleged criminal guilt. The Court therefore does believe that the probative value of the defense expert witness testimony is substantially outweighed by a danger of confusing the issues or misleading the jury. Nor is the

Court convinced that the probative value of the testimony would be substantially outweighed by a danger of wasting time. Should the testimony waste time at trial, the Court is always free to revisit this ruling and exclude time-wasting testimony. *See Jones v. Stotts*, 59 F.3d 143, 146 (10th Cir. 1995) ("the district court may change its ruling at any time for whatever reason it deems appropriate.") The Government's Rule 403 motion to exclude Defendants' witnesses is denied.

Turning to Defendants' Rule 403 arguments, they state that Mr. Klein and Mr. Ward's "fundamentally subjective, speculative, and unreliable methodology to opine on materiality," and their "aura of authority" would present a "risk of unfair prejudice and mislead[] the jury." ECF No. 123 at 51. The Court disagrees and holds that Mr. Klein and Ward's testimony is neither unfairly prejudicial nor misleading.

"Evidence is unfairly prejudicial if it makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *United States v. Leonard,* 439 F.3d 648, 652 (10th Cir. 2006) (internal quotation marks omitted). The Tenth Circuit has "underscored" that "Rule 403 does not protect a party from all prejudice, only *unfair* prejudice." *Watson*, 766 F.3d at 1242. The Court is not concerned Mr. Klein and Ward's testimony could lead the jury to rest its decision of guilt or innocence on the experts' alleged "aura of authority," rather than a proper evaluation of the crimes charged. Nor are Mr. Klein and Ward's procedures "subjective." Rather, as the Court has explained in some detail in its Rule 702 analysis, both witnesses properly grounded their opinions in methodically reliable sources. In addition, as explained previously, government witnesses are permitted to testify as to whether certain truths, if known, would have influenced their decisionmaking. *Kingston*, 971

F.2d at 486. Because the probative value of Mr. Klein and Ward's testimony is not substantially outweighed by the risk of unfair prejudice or misleading the jury, Defendants' Rule 403 request is denied.

## V. CONCLUSION

For the reasons explained herein, it is therefore **ORDERED** that Defendants Nick L. Medeiros and Bobby Greaves' Motion to Exclude Testimony by Jim Sechrist **(ECF No. 94)** is **GRANTED** so that Mr. Sechrist may not testify as an expert witness. But the Court **RESERVES RULING** on the admissibility of Mr. Sechrist's lay testimony. The United States' Motion to Exclude Irrelevant Witnesses, or in the Alternative for a *Daubert* Hearing **(ECF No. 96)** and the Defendants' Motion to Exclude Testimony by John Klein and Ben Ward **(ECF No. 100)** are **DENIED**, but limitations are placed on certain testimony as explained herein. Finally, should Defendants wish to call Ms. Connally or Ms. Foster as fact or character witnesses, Defendants must file a motion with supporting authorities demonstrating the admissibility of their testimony.

**IT IS SO ORDERED**.

HONORABLE JUDITH C. HERRERA
Senior United States District Judge