IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                      Cr. No. 18-1966-JCH

NICK L. MEDEIROS, and
BOBBY GREAVES,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the *Renewed Motion for Judgment of Acquittal* (ECF No. 176) and the *Motion for New Trial* (ECF No. 177) filed by Defendants Nick L. Medeiros and Bobby Greaves ("Defendants"). The Government opposes the motions. The Court, having considered the motions, arguments, evidence, and applicable law, concludes that the renewed motion for judgment of acquittal should be granted as to Counts 2, 3, and 4, but denied as to Count 1, and the motion for new trial should be granted as the verdict was against the weight of the evidence and influenced by cumulative prejudice arising from multiple trial errors. The Court does not overturn a decision by a jury lightly, but finds it is necessary in this case to prevent a miscarriage of justice.

I.      **PROCEDURAL HISTORY**

        **A.  ALLEGATIONS IN THE SUPERSEDING INDICTMENT**

Nick L. Medeiros and Bobby Greaves are brothers-in-law. They partially owned NJM, Inc. ("NJM"), a construction business established in 2012. (Superseding Indictment ¶¶ 10-12, ECF No.

66.) Defendant Medeiros is a service-disabled veteran ("SDV"), and according to the Superseding Indictment, he used that status to gain preferential construction contracts set aside for military veterans under the Service-Disabled Veteran-Owned Small Business Program ("SDVOSB") by giving subcontracting work to another construction business called JSR, Inc. ("JSR"), which is owned by Defendant Bobby Greaves and his wife, Nancy Greaves. (*Id.* ¶¶ 10-16.) As a result of Defendant Medeiros' SDV status, NJM allegedly applied for and received federal government construction contracts between 2012 and 2016 that are reserved for SDVOSBs. (*Id.* ¶ 16.) According to the Superseding Indictment, in obtaining these contracts, Defendants misrepresented the relationship between NJM and JSR to the United States Department of Veterans Affairs ("VA") and the United States Air Force ("USAF"). (*Id.* ¶ 21.) The Government alleged that Defendants submitted documents to the VA and USAF representing that NJM could perform significant portions of the contract work without using JSR employees or equipment, passed off JSR employees as NJM employees, used JSR employees and equipment to perform the contract work, and concealed NJM's inability to provide sufficient employees and supervisors to complete contracts without JSR's assistance. (*Id.* ¶¶ 21-22(c).)

The grand jury charged Defendants in Count 1 with conspiring to defraud the United States, conspiring to commit major fraud and wire fraud against the United States, and conspiring to make materially false statements and representations to influence a decision of an Executive Branch agency. Count 2 alleged that Defendants committed major fraud against the government by means of false and fraudulent pretenses to obtain a USAF contract valued at $1 million or more by falsely certifying that NJM met SDVOSB and Small Business Administration ("SBA") standards for independence and veteran control. Counts 3 and 4 asserted that on certain dates Defendants made materially false, fictitious, and fraudulent statements and misrepresentations to the government.

### B. Trial and Post-Trial Motions

The Court held a seven-day jury trial in this matter. At the close of the Government's case, Defendants moved to acquit on all counts. The Court initially reserved ruling on the motion and stated its significant concerns about whether the Government proved the charges. Nevertheless, after expressing its reservations about whether the evidence was sufficient to show a criminal conspiracy, the falsity of statements, materiality, and criminal intent, the Court allowed the case to go to the jury.

After deliberating for less than three hours, despite voluminous exhibits and instructions, the jury returned a verdict finding Defendants guilty on all four counts. (*See* Verdict, ECF No. 170). The Court then denied Defendants' motion for judgment of acquittal in an oral ruling. On March 29, 2022, Defendants timely filed a *Renewed Motion for Judgment of Acquittal* (ECF No. 176) and a *Motion for New Trial* (ECF No. 177). Having reviewed these motions, the Court's initial concerns about the sufficiency of the evidence and the potential prejudice to Defendants in the way the trial unfolded have only grown.

This case is not the typical conspiracy case. It began, not through a protest from a competing bidder or a complaint from the USAF, SBA, or VA, but from a complaint from a whistleblower searching through publicly available files on the internet. (*See* Mem. Op. and Order 25-26, ECF No. 124.) It is undisputed that Nick Medeiros is a service-disabled veteran who returned from military service to work in the construction industry for the family-owned business of his brother- and sister-in-law, Bobby and Nancy Greaves. It is further undisputed that Bobby and Nancy Greaves desired to help Nick Medeiros start and support a new veteran-owned small business and that Bobby Greaves worked with Nick Medeiros to help get NJM established as a SDVOSB. In that pursuit, Nick Medeiros and Bobby Greaves submitted mounds of evidence and

paperwork to the VA and SBA that revealed involvement of Bobby Greaves and JSR in assisting Nick Medeiros and NJM to get the new business going. The SBA even approved a mentor-protégé agreement between JSR and NJM in November 2015. It is also undisputed that NJM received SDVOSB certification from the VA; that NJM was awarded certain contracts from the USAF as the prime contractor; that the USAF knew that NJM was teaming with JSR on the contract work; that no one filed a protest regarding the awarding of the Weapons Cleaning and Drop Zone USAF contracts to NJM; that NJM, using NJM and JSR employees, completed the work; and that there were no deficiencies cited for that work.

While those facts were undisputed, what was strenuously debated at trial was the falsity of a few statements submitted to the federal agencies among the many thousands of pages of documents submitted to them.[1] Also vigorously disputed at trial was the criminal, fraudulent intent of Defendants in submitting certain statements to various federal agencies in their efforts to gain SDVOSB status for NJM and to win certain government construction contracts. The affirmative false statements charged, however, were statements that were made in the context of a complex regulatory scheme, in which the determination of falsity and criminal intent depended upon Defendants' understanding of the regulatory environment and the flexibility of contract terms. The manner in which the case was charged required the jury to determine whether Defendants should have known that NJM was not a SDVOSB, a determination that the agencies themselves had yet to make based on multiple regulations and factors.[2]

The complicated nature of the case heightened the need to avoid the potential for further confusion. But the way in which the trial proceeded resulted in the admission of prejudicial

---

[1] One USAF contract alone contained approximately 10,000 pages. (*See* Tr. 418:6-23.)

[2] Notably, on August 7, 2019, after the date of indictment, CVE sent an email inquiring whether NJM was going to re-up with CVE. (*See* Tr. 386:11-20; Defs.' Ex. 3DD.)

evidence that should not have been admitted, argument and comments by the prosecution that could inflame and confuse the jury about the weight to give certain evidence, arguments of counsel that conflated critical elements, and an erroneous jury instruction. The multitude of errors leaves the Court with grave doubts that the jury properly weighed the evidence, especially considering how quickly they deliberated. For the reasons given below, the Court will acquit on Counts 2, 3, and 4 and grant a new trial on Count 1 (and should the Tenth Circuit reverse this Court's decision on Counts 2, 3, and 4, the Court concludes a new trial should be granted on all those counts as well).

## II.      MOTION FOR JUDGMENT OF ACQUITTAL

### A.  STANDARD

Under Federal Rule of Criminal Procedure 29(a), the court on a defendant's motion at the close of evidence must enter a judgment of acquittal for any charged crime for which the evidence is insufficient to sustain a conviction. Fed. R. Crim. P. 29(a). The court may reserve a decision on the motion, submit the case to the jury, and then decide the motion after the jury returns a verdict of guilty. Fed. R. Crim. P. 29(b). "If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." *Id.* Even after a jury has returned a verdict, a defendant may renew a motion for judgment of acquittal within 14 days after a guilty verdict. Fed. R. Crim. P. 29(c)(1). Where a court reserved ruling on the motion for judgment of acquittal until after trial, the court decides the sufficiency question on the basis of the evidence presented by the government. *United States v. Finn*, 375 F.3d 1033, 1037 (10th Cir. 2004).

In considering a motion for judgment of acquittal, the court must "ask whether a reasonable jury could find a defendant guilty beyond a reasonable doubt, viewing the evidence in the light most favorable to the government and drawing reasonable inferences therefrom." *United States v.*

*Vigil*, 523 F.3d 1258, 1262 (10th Cir. 2008). A court conducting this inquiry does not weigh conflicting evidence or consider the credibility of witnesses, but instead determines whether the evidence, if believed, would establish each element of the crime. *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004). Examining all the evidence, including reasonable inferences, a court should acquit only if no rational jury could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Xiang*, 12 F.4th 1176, 1184 (10th Cir. 2021). While the evidence must be "substantial," it does not need to conclusively exclude every other reasonable hypothesis and it does not need to negate all possibilities except guilt. *United States v. Phillips*, 583 F.3d 1261, 1264 (10th Cir. 2009).

### B. Analysis

The Court will begin its analysis in reverse order of the counts.

### 1. Count 4 – False Statement in violation of 18 U.S.C. § 1001(a)

In Count 4, the grand jury charged that on or about August 14, 2014, Defendants "represented to the VA that NJM and JSR do not share facilities, equipment, or employees, knowing then and there that statement to be untrue." (Superseding Indictment 10, ECF No. 66.) Section 1001(a) makes it a crime for a person, in any matter within the jurisdiction of the executive branch, knowingly and willfully to make "any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2). To convict a person for making a false statement in violation of § 1001, "the government must establish the following elements beyond a reasonable doubt: (1) the defendant made a statement; (2) that was false and the defendant knew it was false; (3) the statement was made knowingly and willfully; (4) the statement was made within the jurisdiction of a federal department or agency; and (5) the statement was material." *Finn*, 375 F.3d at 1037. For a statement to be "material," it must have a natural tendency to influence, or be capable

of influencing, the decision of the decision-making body to which it was made. *Id.* at 1038 (quoting *Kungys v. United States*, 485 U.S. 759, 770 (1988)). In making that determination, a court should examine what statement was made and what decision the agency was trying to make. *Id.* Defendants assert that the Government's evidence did not prove beyond a reasonable doubt that the statement charged in Count 4 was false or that the statement was material.

Due process requires that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *United States v. Harra*, 985 F.3d 196, 212 (3d Cir. 2021) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). "Fair warning principles apply with equal force when a defendant is criminally charged as a result of noncompliance with agency regulations or guidance." *Id.* at 213. For this reason, a conviction for concealing material facts cannot stand absent fair notice of the legal duty to make the particular disclosure. *Id.* Fair warning likewise "requires that government agencies communicate their interpretation of their own regulations with ascertainable certainty before subjecting private parties to punishment under that interpretation." *Id.* at 213 (internal quotations omitted). Because it is difficult for an individual to predict how an agency will interpret an ambiguous statute or regulation, "an agency must have clearly communicated its policies before a private party may be sanctioned—much less criminally prosecuted—for violating them." *Id.*

Consequently, "where falsity turns on how an agency has communicated its reporting requirements to the entities it regulates and those communications are ambiguous, fair warning demands that the Government prove a defendant's statement false under each objectively reasonable interpretation of the relevant requirements." *Id. See also United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an interpretive question of law, the government bears the burden of proving beyond a reasonable

doubt that the defendant's statement is not true under a reasonable interpretation of the law."); *United States v. Migliaccio*, 34 F.3d 1517, 1525 (10th Cir. 1994) ("In cases arising under 18 U.S.C. § 1001, which criminalizes making false statements to a government agency, the government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where reporting requirements are ambiguous."). "If a regulator fails to give fair warning, it may still succeed in a false statement prosecution—but only if it proves either that its interpretation is the only reasonable one or that the defendant's statement is false under each reasonable interpretation." *Harra*, 985 F.3d at 214. When an answer would be true on one interpretation of an arguably ambiguous question but false on another, the jury decides whether the Government satisfied its burden to prove that its interpretation was the only reasonable interpretation. *Id.* at 216. On a Rule 29 motion, the judge must determine "whether the Government has introduced sufficient evidence of falsity under each reasonable interpretation of the reporting requirement." *Id.* at 217.

The basis for the charge in Count 4 is a letter signed by both Defendants to the VA dated August 14, 2014, that provided a response to the question the VA posed to either Nick or Bobby, "Please explain the business relationship between NJM Inc. and the outside entities, Do they share facilities/equipment/employees/etc.?" (Gov.'s Ex. 1p.) Defendants responded:

> The business relationship between NJM, Inc., and JSR, Inc., is shown in our service agreement for administrative support which is paid by NJM, Inc. NJM, Inc., also rents a contracting trailer from JSR, as shown in our rental agreement. We are located on the same property *but do not share facilities, equipment or employees* (I pay a service agreement to JSR, Inc., for administrative support as addressed earlier).

(*Id.* (italics added).)

Defendants move for acquittal on the basis that the evidence, if believed, does not satisfy the elements of any subsection of § 1001(a), because Defendants did not share employees.

According to Defendants, the plain meaning of "share" excludes leasing arrangements, and the only evidence in the record is that NJM leased facilities, equipment, and employees from JSR at various times and paid JSR for the leased employees. Defendants argue that a leasing arrangement does not fall within the plain meaning of the word "share."

Quoting definitions from the American Heritage Dictionary and Black's Law Dictionary, the Government counters that the plain meaning of "share" includes using or enjoying something jointly or in turns; holding or having jointly with another; and enjoying or partaking of. (*See* Gov.'s Resp. 4-5, ECF No. 163.) The Government contends that a reasonable jury could find beyond a reasonable doubt that Defendants used JSR's facilities, equipment, or employees in turn; or that the resources were jointly held; or that Defendant Greaves allowed Defendant Medeiros to use facilities, equipment, or employees that Defendant Greaves possessed. (*Id.* at 5.) As for the argument that leased employees are not shared because they are paid for, the Government contends the evidence shows "that there were no arm's length transactions between NJM and JSR, and that NJM was a pass-through for JSR." (*Id.* at 6.) The Court must thus consider whether the meaning of "share" is ambiguous and whether the evidence supports a false statement conviction under each reasonable interpretation of "share."

The Tenth Circuit recognizes two kinds of ambiguity when considering the criminality of a false statement—fundamental and arguable. *See United States v. Strohm*, 671 F.3d 1173, 1178 (10th Cir. 2011). Although many statements can be susceptible to differing interpretations, a conviction for making false statements may be sustained where the evidence shows the defendant understood the question in context and gave a knowingly false answer. *United States v. Schulte*, 741 F.3d 1141, 1150 (10th Cir. 2014). A question may be "fundamentally ambiguous in narrow circumstances" when it is "excessively vague, making it impossible to know—without guessing—

the meaning of the question and whether a witness intended to make a false response." *Id.* A question that is fundamentally ambiguous will lack a meaning about which persons of ordinary intellect could agree or that, to have a mutual understanding by a questioner and answerer, requires it be defined at the time the question was made. *See id.* "In other words, a fundamental ambiguity cannot be the basis for a false statement conviction because a person cannot knowingly give a false reply to a question that defies interpretation despite its context." *Id.*

In contrast to a fundamentally ambiguous question, an "arguably ambiguous question is one which contains more than one reasonable interpretation." *Schulte*, 741 F.3d at 1153. "When a question is arguably ambiguous, 'a witness can still intend, and in fact give, a response that was literally false.'" *Id.* (quoting *Strohm*, 671 F.3d at 1181). When reviewing a conviction based on an arguably ambiguous question, a court determines "whether the government presented evidence sufficient to negate the defendant's alleged understanding of the question." *Id.*

In determining whether a question is fundamentally ambiguous, courts may consider the following factors: "(1) the inherent vagueness—or, conversely, the inherent clarity—of certain words and phrases, (2) the compound character of a question, (3) the existence of defects in syntax or grammar in a question, (4) the context of the question and answer, and (5) the defendant's own responses to allegedly ambiguous questions." *Strohm*, 671 F.3d at 1179. Finding a question fundamentally ambiguous is the exception, not the rule. *Id.* That a term has many dictionary definitions does not make a question with the term fundamentally ambiguous. *Id.* at 1180.

The term "shared" has multiple definitions, but the Court is not convinced the question was so excessively vague as to be fundamentally ambiguous. Although the question was compound and had a grammatical error, it was not posed in a way that would create inherent confusion. Most importantly, the context did not make the meaning impossible to know. The context here—a

written statement to maintain SDVOSB status for NJM—is a formal process to determine whether NJM was sufficiently independently controlled by the SDV, and not another person or entity. The preface to the question was to explain the business relationship between NJM and JSR, followed by a few more specific questions, like whether they shared facilities/equipment/employees, etc. While Defendants argue they had a different understanding of the question, the question is not so vague that no answer can be false as a matter of law. The term "share" is thus not fundamentally ambiguous. *Cf. Strohm*, 671 F.3d at 1180-81 (concluding that whether individual was "involved" in a "sale" was something witness and examiner could come to a mutual understanding of without additional definition, despite multiple definitions of "sale," where question had simple grammatical structure that was not inherently vague, defendant knew to what "sale" question referred as she just corrected counsel regarding what fiscal year it occurred in, and any meaning of "involved" would encompass person who established price of goods); *United States v. Sarwari*, 669 F.3d 401, 408-09 (4th Cir. 2012) (concluding that term "father" in passport application instructions was not fundamentally ambiguous, despite that application did not define term and one of colloquial usages of term may include "stepfather," because formal process for passport application was to determine citizenship and only parental relationship qualifying child for citizenship is created by birth or adoption).

Even if a question was not fundamentally ambiguous, an arguably ambiguous question may defeat a conviction if the defendant responded to an ambiguous question with what he believed to be a truthful answer. *See Strohm*, 671 F.3d at 1178. "A claim that a question was arguably ambiguous is a challenge to the sufficiency of the evidence." *Id.* at 1181. Examining the evidence in the light most favorable to the government, a court considers whether a reasonable jury could have found all the elements beyond a reasonable doubt and may only reverse a conviction on

sufficiency grounds if no reasonable jury could have reached the challenged verdict. *Id.* Where a question was arguably ambiguous because more than one reasonable interpretation of the question exists, a defendant can still intend and give a response that was literally false. *Id.* In such cases, the meaning of a question and the truthfulness of a defendant's answer are generally best left to the jury. *See id.*; *Schulte*, 741 F.3d 1152 (concluding that questions could be mutually understood by agent and defendant within context in which they were asked, so it was question for jury whether defendant interpreted questions as he claimed). However, to "mitigate the ambiguity, the government must present evidence of the examiner's interpretation of the question as well as what the defendant understood it to mean." *Strohm*, 671 F.3d at 1181. In other words, the court must determine whether the jury could conclude from the evidence that the "defendant understood the question as did the government and that, so understood, the defendant's answer was false." *Id.* (quoting *United States v. Sainz*, 772 F.2d 559, 562 (9th Cir. 1985)).

Defendants argue that the term "share" is ambiguous, and that one reasonable interpretation of the term is that leased employees are not shared employees, so Defendants' answer was truthful. Citing Black's Law Dictionary, Defendants define "share" as dividing something into portions. (*See* Defs.' Mot. for J. of Acquittal 15, ECF No. 161.) Defendants contend a paid leasing arrangement does not fit within the meaning of share that suggests gifts divided from the whole. (*Id.*) The jury heard evidence that the agency viewed the term "share" as meaning its common definition, because the term is not defined in the regulations. (*See* Tr. 898:5-11, 946:11-20.) The term "share" was not defined in the Court's instructions to the jury; instead, the jury was instructed to give words used their "common and ordinary meaning unless the context clearly shows that a different meaning was mutually understood by questioner and the declarant." (Court's Instruction No. 13, ECF No. 166.)

Context matters. Here, the VA posited a question used by the agency to help it assess whether NJM constituted an SDVOSB. The determination is based on a complex regulatory scheme. According to the Government's evidence, the term "share" is not defined by any of the agency regulations and is not a regulatory term of art for the SBA. (*See* Trial Tr. 898:5-11; 946:11-20.) While there was not a regulatory definition that said, when employees or equipment are paid for, they are not shared (Tr. 946:11-20), there also were no regulations making clear that employees or equipment were shared when they were used subject to a leasing arrangement.

Turning then to the common meaning of "share," there are multiple definitions. Black's Law Dictionary defines the verb "share" as "To divide (something) into portions." Share Definition, Black's Law Dictionary (11th ed. 2019). As other alternative definitions, the American Heritage Dictionary defines "share" as to use or enjoy jointly or in turns or to allow someone to use or enjoy something that one possesses. Share Definition, American Heritage Dictionary, https://www.ahdictionary.com/word/search.html?q=share (last visited August 1, 2022).  It is not clear from these definitions whether a leasing arrangement falls within the concept of "share." A "lease" is the grant of the use of something to another in return for rent or other consideration. Lease Definition, Black's Law Dictionary (11th ed. 2019). Where there is a lease of employees, the lessee has the right to use the employees during the term of the lease in a manner that would not necessarily be joint. Considering the varying meanings in this context, the term "share" does not have inherent clarity and is arguably ambiguous as to whether it encompasses leasing arrangements.

Most significantly, administrative decisions suggest an ambiguity existed. According to decisions of the SBA's Office of Hearings and Appeals, leased facilities are not shared facilities. *See*, *e.g.*, *Size Appeal of: Patriot Construction, Inc., Appellant Re: K.O.O. Construction, Inc.*, SBA

No. SIZ-5439 (S.B.A.), 2013 WL 1793936, at *4 (Jan. 31, 2013) ("The two concerns share an address, but the record establishes that *they do not share facilities. TTCS leases its premises from KOO*.") (emphasis added); *Gonzalez Sanitation Co., Appellant Re: Dep't of the Air Force San Antonio, Texas*, Docket No. SIZ-83-12-8-356, 1984 WL 41825, at *4 (Jan. 30, 1984) (explaining that entities did not share common facilities where one entity had one year lease for office facilities from other entity). The analysis in this line of administrative decisions could be reasonably construed to apply to leased employees and leased equipment. Based on prior administrative decisions, the meaning of "share" could reasonably be construed in the manner advocated by Defendants to exclude providing employees under a leasing arrangement.

In light of the ambiguity and the reasonableness of Defendants' interpretation based on administrative decisions in related contexts, fair warning principles apply. Consequently, the Government had the burden of presenting enough evidence to negate Defendants' alleged understanding of the question. *See Schulte*, 741 F.3d at 1153. It was the Government's burden to introduce proof sufficient to establish the falsity of the statements as well as the defendant's knowing and willful submission of the statements, and in "carrying out that burden the government must negative any reasonable interpretation that would make the defendant's statement factually correct." *United States v. Anderson*, 579 F.2d 455, 460 (8th Cir. 1978).

Turning to the evidence in the Government's case-in-chief, the United States presented testimony and documentary evidence that NJM used JSR employees on projects. But, given the reasonableness of Defendants' interpretation that leasing is not sharing, the Government needed to prove that it was false that Defendants leased employees or that Defendants did not really believe that leasing did not constitute sharing. In their August 14, 2014, letter, Defendants disclosed the service agreement and the rental contract for the trailer but then said that they "do not share

facilities, equipment or employees." (Gov.'s Ex. 1p.) Their statements were thus internally consistent that they did not believe the leasing of facilities constituted sharing.

The Government also provided evidence of Defendants concealing information about NJM's use of JSR employees. Evidence established that Defendants did not disclose the oral leasing arrangement to the SBA, VA, or the Center for Veterans Enterprise ("CVE"), an office within the VA. In answer to question (4), Defendants disclosed both the service agreement to JSR for administrative support and the rental agreement for NJM's office, indicating that they understood the question to seek explanations for the contractual business relationships between them, to include the sharing of facilities, equipment, and employees via leasing arrangements. Yet, Defendants failed to disclose any oral leasing agreement for employees in the letter. The Government, however, did not base Count 4 on the omission in the letter, but rather on the falsity of the affirmative statement.

In addition, there is evidence that in 2013, a CVE investigator interviewed Defendant Medeiros on behalf of the VA about the use of JSR employees, and Medeiros disclosed he used two JSR employees on one project for which JSR billed NJM for six hours of work, but it was the only time NJM used any JSR employees. (*See* Trial Tr. 454:25-13; Gov.'s Ex. 1-n at 22.) The jury heard evidence that Nick Medeiros on June 26, 2013, told the CVE investigator that, other than the one project, he had not hired JSR as a subcontractor. (*See* Trial Tr. 450:16-454:14.) There was evidence that five days later, on July 1, 2013, NJM entered a subcontractor relationship with JSR. (Trial Tr. 451:20-452:18.) This evidence indicates that Defendant Medeiros was attempting to conceal the full extent of NJM's use of JSR employees, but it does not establish that NJM did not lease employees from JSR or that Defendants did not really believe that leased employees were not shared employees.

15

The Government also submitted evidence from which a jury could conclude that Defendants would have understood that the VA, in asking the question in the August 14, 2014, letter, was seeking information about all uses of facilities/equipment/employees between JSR and NJM, whether by a sharing or leasing agreement. Defendants' prior application for SDVOSB status had been denied in 2012 due to potential dependency on JSR. (*See* Gov.'s Ex. 1t at 1-2.) NJM requested reconsideration and included evidence that NJM is a stand-alone entity with no undue influence by or dependency on a non-veteran entity. (*See* Gov.'s Ex. 1t at 2.) Other evidence indicates that Defendants were aware of the factors that the Government considered in maintaining NJM's small business designation from the SBA, which included whether NJM and JSR had common ownership and management, and for that reason, the Government wanted explanations of all business relationships between the companies, including leasing arrangements. (*See* Gov.'s Ex. 5a at 2, 59, 64 (June 19, 2014, letter from SBA seeking further information from Defendants regarding explanation of all business relationships, including equipment rental or subcontracting arrangements, because "SBA may find the firm to be affiliated with this business for size purposes based on common ownership and management"; Trial Tr. 562:5-567:18.) In a separate form given to the SBA, Defendants disclosed the service agreement, but did not disclose the oral leasing agreement of employees, even though the question asked more broadly whether NJM used the services of another business concern. (*See* Gov.'s Ex. 5a at 64.) Similarly, when asked if any outside entities provided office space or equipment to NJM, NJM listed JSR, but in answer to the nature of assistance provided, NJM only noted the lease of the company trailer. (Gov.'s Ex. 5a at 64.) Defendants did not disclose the building in Clovis with "JSR" on the door that NJM listed as

its own satellite office or an oral leasing agreement for equipment.[3] (*See* Trial. Tr. 559:16-560:9, 568:18-569:14, Gov.'s Ex. 5a at 64; 4V.)

The Government also solicited testimony from Agent Siegfried that he never heard that JSR and NJM had an oral leasing agreement before the service of the target letter. (*See* Tr. 529:3-530:20.) During execution of a search warrant of NJM, an investigator found two types of business cards of Paul Willstrop – one stating he was a senior project manager for JSR and one saying he was a senior project manager of NJM. (Tr. 294:20-25, Gov.'s Ex. 18.) Mr. Willstrop was the only employee other than Nick Medeiros listed as an NJM employee from March 2013 to February 2015. (Tr. 341:18-342:12; Gov.'s Ex. 8b.) Emails indicated that Mr. Willstrop was doing JSR work and managing JSR's jobs in New Mexico in April 2015, although Patricia Cullum testified that she was not aware that Mr. Willstrop worked for JSR at the same time he worked for NJM. (Tr. 630:10-631:1, 633:24-634:11, Tr. 707:14-17; Gov.'s Ex. 13c at 5, 10-11 (indicating that Paul Willstrop was "dual hatted" for a Conchas Dam project through JSR in April 2015).)

While the Government provided evidence that Defendants omitted disclosing the oral leasing agreement between NJM and JSR to the SBA and VA, that evidence is insufficient to establish that Defendants' *affirmative* representation that they did not share employees was false based on their reasonable interpretation of the meaning of share to exclude leasing arrangements. In Count 4, the Government did not allege a concealment theory for what Defendants failed to disclose in the August 14, 2014, letter; rather, the Government asserted that Defendants' affirmative statement that they did not share employees, facilities, and equipment was false. Even construing all inferences in the United States' favor, the Government's evidence was insufficient

---

[3] No dates are given for when the photograph of the Clovis office was taken. (*See* Tr. 559:16-560:9.) The Court is not convinced that the Government in its case established that on August 14, 2014, Defendants made a false statement that they did not share facilities based on the listing of the Clovis office address.

to meet their burden to show beyond a reasonable doubt that Defendants did not really believe their reasonable interpretation or, alternatively, was insufficient to show that they shared employees, facilities, or equipment outside a leasing arrangement. Consequently, Defendants are entitled to acquittal on Count 4.

### 2.   Count 3 – False Statement to USAF in violation of 18 U.S.C. § 1001(a)

Count 3 alleges that on July 18, 2013, Defendants knowingly and willfully represented to the USAF that NJM would provide project manager, contract administrator, quality control, safety manager, and superintendent for the Drop Zone contract, knowing then and there that statement to be untrue, in violation of 18 U.S.C. § 1001(a). Defendants made the purported misrepresentation in the Teaming Agreement between NJM and JSR that NJM submitted with its application for the Drop Zone contract. (*See* Trial Tr. 545:1-10, 547:9-548:2; Gov.'s Ex. 4e.) Exhibit A to the Teaming Agreement stated:

> JSR, Inc. will be the Subcontractor as referenced herein and will provide construction support services to NJM for trades …. JSR agrees that NJM, as the Prime Contractor, will be responsible for all contract management, supervisory and administrative functions and NJM will provide personnel responsible for these functions including, but not limited to the Project Manager, Contract Administrator, Quality Control/Safety Manager(s) and Inspector(s) and Superintendents.

(Gov.'s Ex. 4e at 8.) Exhibit A further explained: "NJM possesses the sole authority to award the work described in the preceding paragraph," and "NJM has the authority to perform some or all of the activities described in Section 4 of Exhibit A or to utilize the services of other companies at its sole discretion." (*Id.*)

Defendants argue the alleged false statement set forth in Count 3 was outside the jurisdiction of the executive branch of the United States government and that the Government did not satisfy all the elements necessary for a § 1001(a) conviction.

### a. Whether the Government proved the false statement was made within the jurisdiction of the Air Force

Courts should not narrowly construe the term "jurisdiction" within the meaning of section 1001, because the government has an interest in protecting the integrity of official inquiries. *Bryson v. United States*, 396 U.S. 64, 70 (1969). "A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under § 1001." *Id.* at 71. Section 1001 "covers all matters confided to the authority of an agency or department," and thus, an agency has jurisdiction "when it has the power to exercise authority in a particular situation." *United States v. Wright*, 988 F.2d 1036, 1038 (10th Cir. 1993) (quoting *United States v. Rodgers*, 466 U.S. 475, 479 (1984)).

Relying on *United States v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004), Defendants argue that the alleged false statement falls outside the USAF's jurisdiction because it did not exercise any supervisory power over the mutual promises between NJM and JSR in the Teaming Agreement. In *Blankenship*, the Florida highway department ("FDOT") received grants from the United States Department of Transportation ("USDOT"), and as a condition of the grant, the FDOT had to ensure that at least 12% of USDOT's funds for a highway project went to disadvantaged business enterprises ("DBE"), firms owned or controlled by a woman or minority. *Id.* at 1116. The prime contractor on the project, having contracted with the FDOT and ensured the 12% set-aside for subcontracts, subcontracted with H.J. Trucking, a DBE, but the DBE did not have any employees or more than one truck, so it could not perform such a large contract. *Id.* at 1116-17. The DBE then entered into an oral agreement with the Blankenships who agreed to use their company's equipment and employees to do all the work on the project, and Ms. Blankenship prepared subcontracts and leases, among other things, to create the appearance that the DBE's employees were performing the work. *Id.* at 1117. Although the funds with which the prime

19

contractor paid the DBE originated with the federal government, the Eleventh Circuit ruled that the purported false statements in the subcontracts and leases that the defendants made to the prime contractor concerned a matter outside the jurisdiction of the federal government within the meaning of § 1001. *See id.* at 1136-37. The *Blankenship* court explained that the USDOT did not have power over the agreements between the prime contractor and defendants where it could not compel either party to rescind or modify the agreement. *Id.* at 1137.

Defendants contend that the Teaming Agreement is between private parties and that the promise made between NJM and JSR regarding who would supply certain key team members was not subject to USAF approval, was not required by the USAF's request for proposal ("RFP"), and was voidable by NJM. As part of the application, the USAF required the applicant to submit "resumes for key team members" that conform to the requirements in Section M, paragraph M.2.3.2, which included a Quality Control Officer and Construction General Foreman. (Gov.'s Ex. 4c at 32, 84.) Although Section M did not require that the key team members be from the prime contractor, it did request an organizational chart describing the leadership and communication of the applicant's team. (Gov.'s Ex. 4c at 84; Tr. 671:10-14.) According to Defendants, because the RFP did not require the key team members to be from the prime contractor, the promises made in the Teaming Agreement were not subject to the USAF's approval, and thus, the alleged false statement concerned a matter outside the jurisdiction of the federal government.

The Court finds *Blankenship* distinguishable on the issue of jurisdiction, because unlike in *Blankenship*, here Defendants submitted the Teaming Agreement directly to the government agency with the authority to award the contract. The evidence at trial in the Government's favor is that NJM submitted the Teaming Agreement to the USAF as part of NJM's application for the Drop Zone RFP. (*See* Gov.'s Ex. 4c at 1; Gov.'s Ex. 4e; Def.'s Ex. 11D; Tr. 670:21-671:6.) While

the promises within the Teaming Agreement were not subject to USAF approval, the agreement was submitted to the USAF as part of the RFP, over which the USAF did have power. Awarding the contract based on the information submitted in the application was a function and within the authority of the USAF. (*See* Tr. 780:17-789:25.) Consequently, there is evidence from which a jury could find beyond a reasonable doubt that Defendants' application was within the jurisdiction of the USAF as to the Drop Zone contract. *Cf. Wright*, 988 F.2d at 1038-39 (concluding that submission of false turbidity data to state agency fell within jurisdiction of EPA within meaning of 18 U.S.C. § 1001 where reports were required by regulations promulgated by EPA pursuant to federal law); *United States v. Wolf*, 645 F.2d 23, 24-25 (10th Cir.1981) (concluding that false statement was within jurisdiction of federal agency where defendant falsely certified to re-seller that he was selling company "stripper crude oil" rather than inferior fuel oil where re-seller then relayed same false statement to Department of Energy, which in turn based its entitlement program on reports). *See also United States v. Jackson*, 608 F.3d 193, 197-98 (4th Cir. 2010) (distinguishing *Blankenship*, and to extent it could not be distinguished, following majority of circuits in holding that defendant's falsified time sheets that were submitted to his subcontractor employer on time and materials contract with NSA, because NSA had authority not to pay false invoices no matter through how many intermediaries' hands it passed and had power to revoke his security clearance).

### b.  Whether the Government proved the statement was false

A contract may be "false" if it contains factual misrepresentations. *Blankenship*, 382 F.3d at 1132. "Many courts of appeals have upheld convictions of defendants who made promises or guarantees concerning their future actions that, at the time they made those promises, they had no intention of carrying out." *Id.* at 1133. *See, e.g.*, *United States v. Shah*, 44 F.3d 285, 294 (5th Cir. 1995) ("under section 1001, a promise may amount to a 'false, fictitious or fraudulent' statement

if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform").

Again, relying on *Blankenship*, Defendants assert that the United States did not prove that the Teaming Agreement was "false" because the contract was not a factual assertion to the United States and was not a requisite certification for the Drop Zone contract. The Eleventh Circuit in *Blankenship* overturned the false statement convictions that relied on leases entered into between the DBE and the company who actually conducted the work because the promise was "not a certification that the promisor will actually perform the specified acts, or presently intends to perform those acts, but is instead a grant of a legal right to the other party to either enjoy performance or receive damages." *Blankenship*, 382 F.3d at 1133. The court stated that contractual rights may be waived and gives each party only a legal expectancy in having the other party either perform or respond in damages. *Id.* at 1133-1134. It further explained:

> Presentation of a contract to a third party does not convey and implicitly guarantee either that the parties to the contract intended to perform, or that they intended to actually enforce their contractual rights. A contract is nothing more, and nothing less, than what it actually states. Consequently, though the contracts in one sense may be "shams," in that neither party ever intended to enforce their contractual rights, this does not render the contracts "false."

*Id.* at 1134.

The Eleventh Circuit distinguished the case from those in which a person makes a certification on an application for a government program in which "he is *actually certifying* that he believes those statements concerning his future behavior are true." *Id.* at 1133. For example, it found the case of *Corcoran v. United States*, 229 F.2d 295 (5th Cir. 1956), distinguishable wherein the Fifth Circuit upheld a § 1001 conviction of veterans who obtained G.I. loans to buy houses who had to promise on loan applications that, at the time they filled out the application for government assistance, they actually intended to live in the house they were buying. *Id.* It instead

found the case of *Williams v. United States*, 458 U.S. 279 (1982), more on point wherein the Supreme Court overturned a false statement conviction to federally insured banks that was based on the defendant depositing checks drawn on his first account with the bank holding his second account, knowing that there were insufficient funds to cover the deposit. *Id.* at 1134-35. *Blankenship* relied on the Supreme Court's reasoning in *Williams* that a check is not a factual assertion at all as to the state of the bank balance; rather, it only directs the drawee banks to pay the face value to the bearer while committing the defendant to make good the obligations if the bank dishonored the drafts. *Id.* at 1135. The Eleventh Circuit concluded that, like a check, a contract does not make any representations to a party's intention to perform instead of paying damages or to exercise its rights under the contract. *Id.*

At least one circuit indicated possible disagreement with the Eleventh Circuit's analysis of when a contract can be deemed a false statement. In *United States v. Rowland*, the defendant was convicted of violating an obstruction-of-justice statute that prohibited knowingly falsifying or making a document with the intent to obstruct an investigation within the jurisdiction of a United States agency. *See* 826 F.3d 100, 107 (2d Cir. 2016). The Second Circuit, applying an approach that "diverges" from that of the Eleventh Circuit in *Blankenship*, concluded that a contract may be "falsified" if "it misrepresents the true nature of the parties' agreement." *Id.* at 110. The Second Circuit upheld the conviction for falsification of documents to obstruct an investigation by a United States agency where evidence showed the defendant drafted a contract that intentionally did not reflect the arrangement contemplated by the parties for the defendant to provide political consulting services, rather than business consulting services, in an effort to avoid campaign disclosure laws. *See id.* at 110-11.

Neither party cited Tenth Circuit law on this issue. In the related context of a false statement to a bank, the Tenth Circuit, relying on the *Williams* case, held that a promise to pay in a promissory note is not a factual assertion, but a commercial term that means what the legislature chooses it to mean. *United States v. Rothhammer*, 64 F.3d 554, 557 (10th Cir. 1995). Its holding, however, was limited to the statutory meaning given to a "promise to pay" contained in the commercial instrument. *See id.* at 557-58. The Tenth Circuit noted, however, that the subjective intent of the maker of a note could become relevant if evidence existed of extracontractual promises. *Id.* at 557. It also distinguished the case of *United States v. Shah*, 44 F.3d 285 (5th Cir. 1995), that upheld the conviction of a defendant who, in a solicitation agreement, made a promise not to knowingly disclose the prices in the offer, when the evidence showed that he did not have a present intention to perform. *Id.* at 558 (distinguishing *Shah*, 44 F.3d 285).

The Court is not convinced that the Tenth Circuit will follow the reasoning of *Blankenship*, and instead, is likely to follow the approach of the Second and Fifth Circuits in which the submission of a contract to an agency may constitute a false statement if it misrepresents the true nature of the parties' agreement or constitutes an assertion of a present intention to perform when in fact the promisor has no present intent to perform. *See Rowland*, 826 F.3d at 110; *Shah*, 44 F.3d at 294. The question then is whether the Government submitted sufficient evidence for a jury to conclude that the statement "NJM will provide personnel," including project manager, contract administrator, quality control, safety manager, and superintendent, for the Drop Zone contract was a promise it had no intention to perform at the time it was made or misrepresented the true nature of the parties' agreement.

The Government contends that the facts here establish that Defendants, in submitting the Teaming Agreement to the USAF in support of their application for the Drop Zone contract, made

a false statement to the government upon which they intended the USAF to rely. Section 4 of

Exhibit A to the Teaming Agreement stated:

> NJM, as the Prime Contractor, will be responsible for all contract management,
> supervisory and administrative functions and NJM will provide personnel
> responsible for these functions including, but not limited to the Project Manager,
> Contract Administrator, Quality/Control/Safety Manager(s) and Inspector(s) and
> Superintendents.
>
> ■ JSR further understands that NJM possesses the sole authority to award the
>   work described in the preceding paragraph or additional work not specifically
>   described should it elect to do so. Conversely, NJM has the authority to perform
>   some or all of the activities described in Section 4 of Exhibit A or to utilize the
>   services of other companies at its sole discretion.

(Gov.'s Ex. 4e at 8.) The Government also relies on a merger clause in the document: "This

Teaming Agreement constitutes the entire understanding and agreement of and between NJM and

JSR with respect to the subject matter hereof and supersedes all prior representations and

agreements, verbal or written. It shall not be varied, except by an instrument in writing of

subsequent date…." (Gov.'s Ex. 4e at 7.)

According to the Government's evidence, at the time of submission of the Teaming

Agreement to the Air Force, NJM only had two employees – Nick Medeiros and Jose Arguello –

and Mr. Arguello did not ultimately perform work on the Drop Zone contract because he

subsequently left NJM. (*See* Tr. 548:3-19, 550:5-552:7.) Evidence also indicated that the

Superintendent for the Drop Zone project, Jeremy Sullivan, and the back-up Superintendent,

Jeremy Garcia, were employees of JSR. (*See* Tr. 551:23-553:4; Gov.'s Ex. 4m, 4n, 4o.) Defendant

Medeiros represented to the USAF that Mr. Sullivan was an employee of NJM. (*See* Tr. 551:23-

553:4; Gov.'s Ex. 4m, 4n.) The Government also relies on evidence in which employees

represented themselves as NJM employees, rather than JSR employees. (*See*, *e.g.*, Tr. 555:4-16.)

The Government thus contends that a jury could conclude that, at the time Defendants submitted

the Teaming Agreement to the USAF, they knew that NJM would not provide all the listed supervisory positions because it did not have enough employees to work those positions.

On the other hand, Defendants argue that the promise made in the first part of Exhibit A § 4 was qualified by the second sub-part of paragraph 4 that stated: "NJM has the authority to perform some or all of the activities described in Section 4 of Exhibit A *or to utilize the services of other companies at its sole discretion*." (Gov.'s Ex. 4e at 8 (italics added).) The Court agrees that this latter provision modifies the former statement of what positions NJM will provide and expressly gives NJM discretion to lease employees for those positions. Because of the broad drafting of section 4 that gave NJM authority to lease employees for the identified positions, the Court is not convinced that the Defendants understood the merger clause to preclude lease agreements that were expressly contemplated by the parties when giving NJM the discretion to enter into leasing agreements in section 4. Indeed, while Maripet Short testified that, based on her reading of the Teaming Agreement, she expected the positions of project manager, contract administrator, quality control, safety manager, and superintendent to be NJM employees, (Tr. 814:14-815:2), she acknowledged that the Teaming Agreement could be interpreted in different ways, (*See* Tr. 812:2-20). Ms. Short, after looking at the second sub-part of paragraph 4, agreed that the Air Force was aware that NJM could use JSR for contract management, supervisory administrative functions, project manager, contract administrator, quality control, and safety. (Tr. 812:2-20.) The Government's evidence was insufficient for a reasonable jury to conclude that the Teaming Agreement was "false" in the sense that it misrepresented the true relationship of NJM and JSR where the contractual language gave NJM so much discretion to utilize employees from other companies.[4]

---

[4] The same result would occur if the Tenth Circuit utilized the Eleventh Circuit's analysis. Under the reasoning of *Blankenship*, the statements in the Teaming Agreement would not constitute false statements. The Teaming

The Court acknowledges that John Klein opined that his interpretation of the Teaming Agreement was that NJM would control supervisory functions, not JSR, so NJM would not subcontract to JSR the roles of project manager, contract administrator, quality control, etc. (*See* Tr. 849:24-851:6, 852:19-853:25.) According to Mr. Klein, reading the Teaming Agreement in the context of the SBA requirements, results in the interpretation that NJM would not subcontract the listed supervisory roles to JSR. (Tr. 871:11-16.) But he too acknowledged that people could read the Teaming Agreement in different ways and that subcontracting was permissible so long as the prime contractor met the 15 percent rule with its own employees. (*See id.* 871:11-873:5.) The Government, however, did not present evidence in its case-in-chief that on July 18, 2013, when Defendants submitted the Teaming Agreement, they knew NJM would not be able to meet the 15 percent rule. Even construing the facts and inferences in favor of the Government, the evidence in the Government's case-in-chief showed more than one way to construe the Teaming Agreement, and that it could reasonably be construed to permit NJM to subcontract out even the supervisory roles to JSR.

Notably, this is not a situation where the USAF, as part of the contract, asked Defendants to certify that they would only use NJM employees for the roles of Project Manager, Contract Administrator, etc. That is not what the evidence shows. Instead, the evidence is that they submitted a contract with terms that gave NJM authority to subcontract out the identified management positions to another company, including JSR. Moreover, as for evidence suggesting that NJM could not subcontract out all the work it did to JSR and still meet the 15% rule, even if

---

Agreement was not a forged document. Nor did it contain affirmative statements of fact that were blatantly untrue, comparably to a back-dated contract. *Cf. Blankenship*, 382 F.3d at 1132-33. According to *Blankenship*, a contractual agreement cannot be a false factual assertion, because it only gives a party the legal right either to performance or compensation. *See id.* at 1135. The evidence at trial did not establish that the relevant provision of the Teaming Agreement functioned as a certification of a fact, and should the Tenth Circuit follow *Blankenship*, the statements contained within the Teaming Agreement would not constitute false statements.

NJM violated the 15% rule, that does not make the language of the Teaming Agreement a false statement. The Teaming Agreement did not say that NJM would only award work to JSR in accordance with the 15% rule. For Count 3, the United States relied on a statement that was qualified by other contractual language that could reasonably be construed to permit NJM to subcontract out "some or all of the activities" described in Section 4. The Court is thus not convinced the Government met its burden to prove beyond a reasonable doubt that only its interpretation of the Teaming Agreement was reasonable and that the provision of the contract, read together with the other contractual provisions, was false. Criminal liability should not attach under these circumstances, and the Court will grant Defendants' motion to acquit on Count 3. *Cf. Migliaccio*, 34 F.3d at 1525 (holding that government bears the burden to negate any reasonable interpretations that would make a defendant's statement factually correct where there is ambiguity).[5]

Defendants also contend that the evidence as to Count 3 was insufficient to prove that the statement in the Teaming Agreement was material where the Drop Zone RFP never required NJM to promise that key team members would be from the prime contractor. The Court need not consider this argument given it is acquitting on the element of falsity.

### 3. Count 2 – Major Fraud against the United States in violation of 18 U.S.C. §§ 1031 and 2(a)

18 U.S.C. § 1031(a) makes it a crime to knowingly execute, or attempt to execute, any scheme or artifice with the intent to defraud the United States or to obtain money or property by

---

[5] Nor is the Court convinced a jury could determine beyond a reasonable doubt that NJM violated the 15% rule on the Drop Zone contract or intended to do so at the time it submitted the Teaming Agreement based on the evidence at the close of the Government's case. On January 30, 2014, Defendant Medeiros listed Paul Willstrop and Jose Arguello as key personnel for NJM on the Drop Zone contract. (Gov.'s Ex. 4-l.) In May 2014, Defendant Medeiros substituted Jeremy Sullivan as the superintendent, replacing Jose Arguello, who had left NJM. (Gov.'s 4m; Tr. 552:1-7.) Defendants submitted the Teaming Agreement in July 18, 2013.

means of false or fraudulent pretenses, representations, or promises, in any contract or in any procurement of services as a prime contractor with the United States where the value of the contract is more than $1,000,000. *See* 18 U.S.C. § 1031(a). According to the Superseding Indictment, Defendants on or about September 27, 2013, "knowingly executed and attempted to execute a scheme and artifice with the intent to defraud the United States, and to obtain valuable contracts, by means of false and fraudulent pretenses, presentations, and promises, by falsely certifying that NJM met SDVOSB and SBA standards for independence and veteran control, in a procurement of services … with respect to U.S. Air Force contract FA4855-13-C-0016…." (Superseding Indictment, ECF No. 66). This contract was described at trial as the "Drop Zone contract."

Defendants move for acquittal on Count 2 because the Government rested purportedly without offering evidence that Defendants made the certification regarding SDVOSB and SBA standards. Defendants argue that the evidence is insufficient to establish that the statement Defendant Medeiros made in checking the box for SDVOSB concern was a representation that NJM met SDVOSB and SBA standards for independence and veteran control. According to Defendants, the Federal Acquisition Regulation ("FAR") clause that the Government relies upon as an act in Count 2 is not an SDVOSB or SBA standard for independence and veteran control.

To prove the alleged false certification, the Government relied on Exhibit 4c at pages 69 to 71, a portion of NJM's application for the Drop Zone contract under the heading "52.219-1 SMALL BUSINESS PROGRAM REPRESENTATIONS (APR 2012) – ALTERNATE I (APR 2011)." (Gov.'s Ex. 4c at 69.) At paragraph (b)(1), Defendant Medeiros checked a box representing NJM to be a small business concern. (Gov.'s Ex. 4c at 69.) On page 70, Defendant Medeiros checked another box representing that NJM was a veteran-owned small business concern and a service-disabled veteran-owned small business concern. (*Id.* at 70.) The document defined a

service-disabled veteran-owned small business concern, as relevant here, to mean a small business concern the "management and daily business operations of which are controlled by one or more service-disabled veterans…." (*Id.* at 71.) It also defined "Small business concern" as "a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR Part 121 and the size standard in paragraph (a) of this provision." (*Id.*) Defendant Medeiros submitted the same representations in Exhibit 4f. (Gov.'s Ex. 4f at 63-65.)

Defendants contend, however, that the certification in FAR 52.219-1 is a separate contractual requirement, not a SDVOSB or SBA standard regarding independence and veteran control. The FAR system is prescribed by the Secretary of Defense, the Administrator of General Services, and the Administrator, National Aeronautics and Space Administration. 48 C.F.R. § 1.103(b). FAR 52.219-1 provided its own definition for "Service-disabled veteran-owned small business concern" and did not reference or expressly incorporate the SDVOSB regulations promulgated by the VA for the meaning of "independence" or "veteran control."

Although the FAR clause did not cite the SDVOSB or SBA standards, the clause itself used the statutory language of the Small Business Act (the "Act") that created the programs. The Act defines "small business concern owned and controlled by service-disabled veterans" as "the management and daily business operations of which are controlled by one or more service-disabled veterans," which is the same language used in the FAR clause. *Compare* 15 U.S.C. § 632(q)(2)(A), *with* Gov.'s Ex. 4c at 71. The FAR clause does not expressly incorporate or cite SBA regulations and standards for the meaning of "independently owned and operated," but the clause does define a small business concern as one that is independently owned and operated *and* qualified as a small business under 13 C.F.R. Part 121. As for the meaning of "independence," FAR describes a "Small

business concern" as a "concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation." (Gov.'s Ex. 4c at 71.) This definition tracks the statutory definition set forth in 15 U.S.C. § 632(a)(1): "a small-business concern … shall be deemed to be one which is independently owned and operated and which is not dominant in its field of operation."

The Government argues that, by checking the identified boxes on the form, Defendant Medeiros stated that the management and daily business operations of NJM were controlled by Defendant Medeiros and that NJM was "independently owned and operated," and that the jury heard evidence refuting those statements. But the Superseding Indictment alleges one step more – that what Defendant Medeiros stated amounted to "certifying that NJM met SDVOSB and SBA standards for independence and veteran control." Based on the law, the Court concludes that the FAR definitions reflect the statutory definitions, and thus, NJM, by signing the FAR clause as it did, certified that it met SDVOSB and SBA standards for independence and veteran control. The next step is to determine if the jury heard sufficient evidence to conclude beyond a reasonable doubt that NJM's certification was false.

Evidence showed that the SDVOSB and 8(a) program are self-certifications, meaning that a firm can self-certify its status as an SDVOSB firm for federal agencies, like the USAF, to which it is applying for a contract. (Trial Tr. 523:6-524:2, 822:17-21.) While the evidence also showed that, on September 27, 2013, NJM had the SDVOSB certification from CVE, (*see* Tr. 874:11-13, 888:16-889:3), the Government's theory was that Defendant Medeiros, aided and abetted by Defendant Greaves, knew that he was not in exclusive control of NJM, that JSR had some control over NJM, and that the facts showed that he made a knowing false statement by saying he was a small business concern.

According to the United States, the jury did not have to determine the issue of control, but rather, they had to decide if Defendants made false statements knowingly to affect the agency decision on control. But that is not how the United States drafted Count 2. The Government alleged that the means of the scheme was falsely certifying that NJM met SDVOSB and SBA standards for independence and veteran control. As alleged, the Government would need to prove that the alleged certification was false – that NJM did not meet SDVOSB or SBA standards for independence and control.

As for the relevant facts, the Government established generally the importance of independence and veteran control to the SBA and VA/CVE. Ben Ward testified that the VA's standards for eligibility, ownership, and control are governed by 38 CFR Part 74. (Tr. 921:25-922:5.) To determine whether a company is an affiliate, a regulatory term, the SBA looks to 13 CFR Part 121.103. (Tr. 890:9-13.) To determine SDVOSB status, the SBA looks at whether the individual claiming ownership and control of the company actually owns and controls the company by examining many factors. (Tr. 823:6-841:10.) Mr. Klein testified that "the fact that a non-disadvantaged individual is involved in the daily operations of the concern, that by itself is quite common," but that the extent of the control or participation is what SBA examines. (Tr. 831:13-21.)

According to Mr. Klein, when examining a particular project, subcontracting of another company's employees is permissible on a given contract, so long as the 15-percent prime contractor requirement was met. (Tr. 903:12-18.) An SBA rule requires that the day-to-day activities at the facility be directed by the prime contractor's employee, so the SBA wants the project manager on site to be an employee of the prime contractor. (Tr. 904:12-17.) He admitted, however, that it may depend on the circumstances if, for example, the prime contractor is offsite

but constantly texting directions. (*See* Tr. 904:18-905:9.) In the latter situation, Mr. Klein would be "skeptical" of the 15-percent requirement being met. (*Id.* 904:18-905:9.)

This Court finds the reasoning of *United States v. Simmons*, 441 F.Supp.3d 1196 (D. Kan. 2020), persuasive in granting a motion of acquittal in like circumstances. In *Simmons*, the United States brought seven counts of making false representations in violation of 15 U.S.C. § 645(d), alleging that the defendant misrepresented the status of two companies as small businesses to obtain prime contracts, and the government brought thirteen counts of wire fraud, alleging that the defendant improperly submitted applications on behalf of one company ("Millennial") to obtain set-aside contracts for small businesses. 441 F.Supp.3d at 1197. Like here, the heart of the government's allegations was that the defendant failed to disclose Millennial's affiliation with a subtracting company ("Figeac"), the affiliation of which would have disqualified Millennial from winning set-aside contracts for small businesses. *Id.* at 1198. In determining the issue of affiliation, the SBA makes the decision and then provides notice and a chance to appeal the decision. *See id.* While the SBA never determined affiliation between Millennial and Figeac, the government introduced evidence that "Millennial used Figeac almost exclusively as its subcontractor on its federal contracts, that Simmons worked for Figeac as an independent contractor, and that Simmons used or attempted to use Figeac employees to perform work for Millennial." *Id.* The *Simmons* court pointed out that the government never provided evidence that Simmons was prompted to disclose these facts when registering with the federal online application process for awarding the individual federal contracts. *See id.* at 1197-98.

Millennial had the small business certification, but the alleged falsity was that the defendant should have known that its affiliation with the subcontracting company might cause the SBA to conclude that Millennial was not, in fact, a small business, and that defendant's failure to

proactively disclose that affiliation when certifying Millennial's small business status was therefore a criminal false statement. *See id.* at 1199. The *Simmons* court found it an affront to justice to hold the defendant "criminally liable for failing to disclose an affiliation that had never been found to exist by the authoritative body responsible for making that determination." *Id.* at 1199-1200. The court refused "to expose a person to criminal jeopardy because an administrative body *might* determine that two entities are affiliated, when nobody has made that determination." *Id.* at 1200. Concluding that no rational juror could find that the defendant made a misrepresentation by failing to disclose an affiliation that had not yet been deemed to exist by an appropriate authority, the court granted the defendant's motion for judgment of acquittal on the false statement counts. *Id.*

As in *Simmons*, the purportedly false certification Defendant Medeiros made in Count 2 did not require disclosure of certain underlying facts pertaining to the affiliation decision. While there was evidence to show that Defendants knew that their level of affiliation might result in rescission of or failure to obtain SDVOSB status, so they did not disclose the full extent of NJM's use of JSR employees on projects, Count 2 required the jury to determine the falsity of the certification itself. When the agencies determine whether a company meets the SDVOSB or SBA standards for independence and veteran control, it is a fact-intensive inquiry based on the totality of the circumstances. The jury, however, was not given sufficient evidence or instruction on the detailed regulations on the SDVOSB and SBA standards that guide the SBA's and CVE's decision-making process to be able to determine beyond a reasonable doubt that as of September 27, 2013, NJM did not meet those standards. Although the jury heard some evidence of the standards from Ben Ward and John Klein, the Court is not convinced that evidence was enough for the jury to make what is essentially the agency determination for certification. The jury

instructions, for example, did not set out the agency law for that determination. For all these reasons, the Court will grant Defendants' motion for judgment of acquittal on Count 2.

### 4.   Count 1 – Conspiracy in violation of 18 U.S.C. § 371

The Government charged in Count 1 that from on or about November 30, 2011, to March 10, 2020, Defendants knowingly and voluntarily conspired and agreed to act interdependently with each other to (1) defraud the United States in any manner and for any purpose; (2) commit major fraud against the United States in violation of 18 U.S.C. § 1031; (3) commit wire fraud in violation of 18 U.S.C. § 1343; and (4) make materially false statements and representations to the United States to influence a decision of the Executive Branch of the United States in violation of 18 U.S.C. § 1001. "Under 18 U.S.C. § 371, a conviction for conspiracy requires that the government prove beyond a reasonable doubt that the defendants agreed to defraud the United States and that one of the conspirators committed an overt act in furtherance of the conspiracy." *United States v. Migliaccio*, 34 F.3d 1517, 1521 (10th Cir. 1994). "An agreement between the defendants to violate the law is an essential element, which must be shown beyond a reasonable doubt." *Id.*

According to Defendants, they are entitled to acquittal on Count 1 for two reasons. First, they argue that they should not be held criminally liable for failing to disclose a loss of lack of status that had never been rescinded or denied by the authoritative body responsible for making that determination. Defendants contend that NJM was a SDVOSB at all relevant times, and the agencies never rescinded that status. Second, they assert that the evidence provides no basis for the jury to select and weigh factors for control and affiliation. Defendants contend that is not enough for criminal liability to attach where the agency has to follow complex, amorphous regulations to determine whether a particular factor amounts to a disqualifying affiliation. In support of their argument as to Count 1, Defendants rely on *Simmons*.

*Simmons*, however, did not involve a conspiracy charge as here that encompasses misleading representations and concealments about the relationship between NJM and JSR to the SBA and CVE in an attempt to influence their decisions on certification. Unlike in Count 2, the conspiracy charge did not require the jury to determine necessarily that NJM was not a SDVOSB within the meaning of the agency regulations. The first listed conspiracy, a conspiracy to defraud the United States, did not solely depend on whether Defendants misrepresented having SDVOSB status and should not have, but rather, it also relied on the efforts to conceal and misrepresent the relationship between NJM and JSR to get and keep that SDVOSB status.

As to the alleged first agreement to defraud the United States, the Government had to prove that Defendants agreed to defraud the United States, that one of the Defendants committed an overt act in furtherance of the conspiracy, that they knew the essential objective of the conspiracy and knowingly and voluntarily participated in the conspiracy, and that they intended to act together for their shared mutual benefit within the scope of the conspiracy. The jury heard evidence of how, construing inferences in the Government's favor, both Defendants worked together to get NJM started as a SDVOSB; that JSR anticipated benefiting from NJM having that status (*see* Gov.'s Ex. 13d at 25; Tr. 705:8-17); that Bobby Greaves and Nick Medeiros attended JSR planning meetings that, among other things, discussed what work NJM would perform (*see* Tr. 705:8-17, 717:19-23); email evidence of how NJM and JSR worked together and JSR provided financial support to NJM (*see* Tr. 620:11-625:1; Gov.'s Ex. 11c, 11d, 13c, 13d);[6] JSR had a business development brochure that listed SDVOSB jobs in the JSR plan (*see* Gov.'s Ex. 13d at 25; Tr. 636:1-18); and they authorized using JSR employees for NJM work (*see*, *e.g.*, Tr. 553:7-557:4; Gov.'s Ex. 4O, 4S).

---

[6] *See* Gov.'s Ex. 13c (January 31, 2014, email in which Nick Medeiros states NJM's overhead monthly burn rate is around $10,000 and Bobby Greaves responds with a solution of a $15,000 invoice to JSR).

This evidence combined with the evidence that Defendants, in order to minimize the perceived degree of affiliation between the two companies, concealed the full extent of NJM's dependence on JSR in their representations to the VA and SBA, including concealing from the SBA (i) how Nick Medeiros' portion of the initial capitalization for NJM derived from a gift from the Greaves, (ii) that NJM received a portion of its revenue from JSR (as revealed by bank transfers), even though an SBA question expressly asked for NJM to disclose the nature of any financial assistance from JSR, (iii) that NJM obtained bonding because of indemnification from JSR, even though the question from the SBA asked for such an indication, (iv) that the signature card on file with NJM's bank still had Bobby Greaves and Rita Jordan as signatories, and (v) that NJM had a Teaming Agreement and an oral leasing agreement with JSR to use JSR employees, even though the SBA specifically asked for whether NJM used the services of JSR. (*See*, *e.g.*, Gov.'s Ex. 5a at 8, 29, 46-47, 59, 64, 66, 70, Gov.'s Ex. 1u, 11c; Tr. 562:7-567:10, 571:1-572:16, 622:7-623:4.) Documentation submitted to the SBA stated that Defendant Greaves did not do any work for NJM, even though email evidence showed otherwise. (*See* Gov.'s Ex. 5a; Tr. 566-22-567:10.) Other evidence, construed in the United States' favor, showed misrepresentations by Defendant Medeiros: he identified Ramon Rico as the safety and health manager for the Weapons Cleaning Room Project, but submitted a resume of Ramon Rico falsely stating he was an NJM employee, (*see* Gov.'s Ex. 3d at 8, 55; Tr. 542:8-543:12); he submitted documents to SSgt. Goldie Silvestre on May 22, 2014, that indicated Jeremy Sullivan was an employee of NJM, despite that Mr. Sullivan was a JSR employee at the time and Defendant had listed Janet Reader as a JSR employee (*see* Gov. Ex. 4m, 4n; Tr. 551:21-553:4); and he submitted documents to the Army Corps of Engineers listing as NJM employees numerous employees who were not NJM employees (Gov.'s Ex. 6f, Tr. 593:2-600:22). As to the Drop Zone Contract, Defendant Medeiros submitted

a Past Performance Questionnaire filled out by Paul Willstrop that indicated NJM had more than one employee working on the prior contract, when at the time NJM's only employee was Nick Medeiros. (*See* Gov.'s Ex. 4h; Tr. 548:23-551:19.) The Court is satisfied that the evidence, viewed in the Government's favor, was sufficient for a jury to conclude that there was an agreement between Defendants to defraud the federal government agencies for the purpose of obtaining SDVOSB contracts by concealing the true relationship that NJM had with JSR to the SBA and VA. *Cf. United States v. Whitney*, 229 F.3d 1296, 1301 (10th Cir. 2000) (explaining that agreement for conspiracy can be proved entirely from circumstantial evidence and can be inferred from circumstances such as sharing a common motive, repeated acts, and mutual knowledge with joint action). For all the foregoing reasons, the Court will deny Defendants' motion for acquittal as to Count 1.

## III.    MOTION FOR NEW TRIAL

### A.  STANDARD

"If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed," and specify the reasons for the determination. Fed. R. Crim. P. 29(d)(1). Defendants move for new trial under Rule 33, which gives the court authority to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A motion for new trial should be granted if, after weighing the evidence and the credibility of the witnesses, the court determines that the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *United States v. Garcia*, 182 F.3d 1165, 1170 (10th Cir. 1999) (internal quotations omitted). A court should grant a new trial motion only in

exceptional cases when the evidence weighs heavily against the verdict. *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009).

Any error, including cumulative error, that is sufficient to require reversal on appeal is a proper ground for granting a new trial under Rule 33. *United States v. Walters*, 89 F.Supp.2d 1206, 1213 (D. Kan. 2000). In examining errors, district courts should consider rules governing appellate review. *United States v. Thomas*, No. 13-CR-01874 MV, 2016 WL 9818560, *7 (D.N.M. Aug. 5, 2016). The post-trial standard of review for claims of trial error is as follows:

> (1) the defendant objects and the court overrules the objection—de novo review; (2) the defendant objects, the district court takes curative action, and the defendant objects to the adequacy of the curative action or asks for a mistrial—abuse of discretion review; (3) the defendant objects, the district court sustains the objection, and the defendant fails to object to the adequacy of the curative action—plain error review; and (4) the defendant does not object at trial but raises the issue on appeal—plain error review.

*United States v. Currie*, 911 F.3d 1047, 1056-57 (10th Cir. 2018).

On de novo review, if the conduct was improper, the Government must demonstrate the error was harmless beyond a reasonable doubt. *Id.* at 1057. Under plain error review for a non-constitutional error, reversal is warranted only when the error was plainly (i.e., clearly) improper and the defendant shows that the error affected his substantial rights. *Id.* at 1057; *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990). An "error" requires a violation of an objective legal rule. *Rivera*, 900 F.2d at 1470 n.7. An error is said to affect a substantial right when it has "a 'substantial influence' on the outcome or leaves one in 'grave doubt' as to whether it had such effect." *Rivera*, 900 F.2d at 1469 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

An error "that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a). The Constitution only entitles a defendant to a fair trial, not a perfect one, so the harmless-error doctrine focuses on the fairness of the trial rather than on the inevitable presence of

immaterial error. *Rivera*, 900 F.2d at 1469 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986)). Most errors of constitutional dimension, however, can only be held harmless if it was harmless beyond a reasonable doubt, but some constitutional errors can never be dismissed as harmless. *Id.* at 1470.

A cumulative-error analysis "aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *Id.* The standard for cumulative error is whether the aggregate of errors affected the defendant's substantial rights. *Id.* In conducting a cumulative-error analysis, courts "should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *Id.* at 1471. Adverse rulings that impact a defendant cannot be the basis for reversal unless they are traceable to error. *Id.*

### B.  ANALYSIS

Defendants assert that they are entitled to a new trial because the weight of the credible evidence shows that a miscarriage of justice occurred. According to Defendants, their convictions should be overturned because they were based on application of disparate agency rules in disparate contexts, and expert defense lawyers had advised them that their answers were truthful based on their expert view of contract and administrative law.

On the motion for acquittal, the Court had to construe all inferences in favor of the Government, but on a motion for new trial, the Court is not so constrained and may consider whether the weight of the credible evidence warrants a new trial to prevent a miscarriage of justice. Weighing the evidence and considering prejudicial statements and questions from the Government, the Court finds that Defendants had a credible defense as to reliance on the advice

of counsel and that the jury may have been confused in a way that caused it to improperly weigh the evidence. This case is an exceptional one where the evidence weighs heavily against the verdict and the errors at trial likely had a substantial effect on how the jury weighed the evidence in this complex case. The Court will thus grant a new trial in the interest of justice.

### 1. Whether the weight of the evidence supports a new trial

Ms. Connally testified that she specifically advised Defendant Medeiros that NJM and JSR did not share facilities, equipment or employees based on the regulations because "when you pay for facilities, equipment and employees, it is not sharing." (Tr. 1095:7-20.) Ms. Connally further testified that she worked with Defendant Medeiros closely with the CVE certification and documentation, and that he knew she had argued to the Government with regard to their 8(a) application that NJM did not share facilities, equipment, or employees. (Tr. 1094:5-1095:6.) She further explained her opinion that NJM was leasing employees from JSR because Defendant Medeiros paid their required wages and benefits, so they were under his direction and control. (Tr. 1096:2-24.) According to Ms. Connally, that the leasing arrangement was based on an oral agreement was within the realm of reasonable business activity, particularly given that it was a contract between family members. (Tr. 1097:1-10.) Her opinion was that the regulations permitted NJM to use leased employees to perform its 15% of a contract. (Tr. 1103:18-1105:15.) Mr. Dulske corroborated Ms. Connally's testimony by opining that there was nothing wrong with NJM using leased employees toward their 15% of a contract. (Tr. 1300:21-1301:7.) Jose Munoz testified that, based on NJM's financial records, his opinion was that NJM leased employees from JSR. (Tr. 1155:19-1157:22.)

Factually, the defense case was strong and credible in negating the intent element for Count 4 based on reliance on the advice of counsel. That Ms. Connally was unaware of certain underlying

facts, like the oral leasing arrangement, did not undercut her advice that such a leasing arrangement was not sharing if the employees were paid. Her statement that the Government should be notified of changes also does not undermine that Defendants relied on her advice that they could say that they did not share employees, equipment, or facilities if they leased them. Defendants were not charged in Count 4 with what they omitted in that statement; rather, they were charged based on the affirmative representation they made. Most significantly, legally, as discussed *supra*, administrative decisions supported Ms. Connally's interpretation of the meaning of "sharing" in the complex administrative framework in which Defendants were operating. The Court has concerns that the jury did not understand the Government's burden to negate the Defendants' understanding of the alleged question, given the reasonableness of their interpretation of the term based on administrative decisions. Weighing the evidence and credibility of witnesses, the Court concludes that the verdict on Count 4 was contrary to the weight of the evidence such that a miscarriage of justice may have occurred.

Similar reasoning compels this Court to find, alternatively, that Defendants are entitled to a new trial on Counts 2 and 3. Turning first to Count 3, although Ms. Connally did not recall whether she knew about the oral leasing agreement for employees, she testified credibly that the Teaming Agreement was drafted broadly to permit NJM to lease employees from JSR and others, including for the positions of project manager, contract administrator, quality control, safety manager, and superintendent. (*See* Tr. 1111:12-20.) Ms. Connally testified credibly concerning her opinion that if NJM leased employees, those employees would be considered NJM employees, evidence that negated Defendants' intent to submit a false statement to the USAF in submitting the Teaming Agreement to it when he acted on the advice of counsel. (*See* Tr. 1080:2-17.) Mr. Dulske likewise testified that the Teaming Agreement was written broadly and loosely. (Tr.

1308:1-2.) Based on its plain terms, the language of the Teaming Agreement gave flexibility to NJM to lease employees for the positions listed in the first subpart of section 4 of Exhibit A to the Teaming Agreement. Defendants submitted essentially the same Teaming Agreement for both the Weapons Cleaning and the Drop Zone contracts to the USAF, and in the paperwork for the former proposal, had informed the USAF that a JSR employee would be the project manager, without the USAF making a size protest. (*See* Tr. 1079:17-1080:1; 1302:18-1303:12.) The weight of the evidence is against a conclusion that Defendants submitted the Teaming Agreement to the USAF knowing that it was a false statement at the time they submitted it, and thus, the Court concludes, in the alternative, that Defendants are entitled to a new trial on Count 3.

As for Count 2, the determination of whether NJM was a SDVOSB relied on the degree of independence and veteran control by the SDV, and whether the totality of circumstances indicated impermissible affiliation between NJM and JSR. Defendants are entitled to a new trial because the weight of the evidence did not establish that Defendant made the certification of having met SDVOSB or SBA standards for independence and veteran control knowing that the certification was false or that the certification was indeed false. As a legal matter, the evidence and authority provided did not show that the SBA or VA clearly deemed leased employees to not be controlled by the prime contractor. Consequently, even if on September 27, 2013, Defendants anticipated NJM using leased JSR employees, that alone does not establish beyond a reasonable doubt that Defendants on September 27, 2013, knew that Nick Medeiros did not control NJM. Rather, that determination is based on a variety of factors that the agencies weigh. The Court is not convinced that the evidence or instructions to the jury gave it the tools to make the determination that NJM was not a SDVOSB based on agency laws. *See United States v. Denny*, 939 F.2d 1449, 1454 (10th Cir. 1991) (explaining that instructions must be read and evaluated in their entirety to "determine

43

whether the instructions, examined in the light of the record as a whole, fairly, adequately, and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them"). Viewing the totality of the record, the Court finds that the evidence preponderates heavily against the verdict for Count 2.

### 2.   Whether cumulative errors substantially affected the fairness of the trial

The Court will first examine whether the purported errors constituted errors before turning to whether the identified errors, viewed in aggregate, affected Defendants' substantive rights.

### a.   Numerous errors occurred at trial

### 1)   Admission of expert testimony by a lay witness was error

In support of Count 2, the Government argued in closing that NJM was a passthrough because it could not have done 15% of the work on that contract unless they secretly paired up with JSR. (*See* Tr. 1517:1-1519:13.) As evidentiary support, the Government solicited testimony from Patricia Cullum about whether NJM could perform 15% of the Drop Zone contract with two employees. (*See* Tr. 712:23-713:20.) The defense objected to the question as improper expert testimony for which she was not qualified to give. (*Id.*) The Court overruled the objection, permitting her to testify if she had personal knowledge for her answer. (Tr. 713:13-15.) Ms. Cullum then testified that NJM could not meet the 15 percent rule if only Nick Medeiros and Paul Willstrop were working for NJM. (Tr. 713:16-20.) On cross-examination, Ms. Cullum admitted that she did not remember how the 15 percent rule was calculated in the relevant time-period and she had never seen the financials or the payroll for either NJM or JSR. (Tr. 722:2-12, 723:11-13.) Indeed, another Government witness confirmed that, to calculate the 15% rule, one had to know the financials for NJM. (Tr. 755:5-9.)

Ms. Cullum did not have the personal knowledge or underlying information to render a reliable opinion as to whether NJM could satisfy the 15% rule on the Drop Zone contract. The opinion required specialized knowledge, and thus, constituted an expert, not lay opinion. The Court erred in admitting Ms. Cullum's opinion.

Because Defendants objected to the error, de novo review applies, and the Government must demonstrate the error was harmless beyond a reasonable doubt. Here, the Government relied on her unreliable opinion in its closing, arguing that her testimony showed that NJM could not meet the 15% rule with NJM having only two employees at the time it applied for the Drop Zone contract. (*See* Tr. 1520:7-21 ("Patty Cullum had an opinion about that.... She said there's no way that you could make 15 percent with just Nick phoning it in from a trailer in Texas and Jerry Sullivan actually being a JSR employee. You don't have any direct evidence that they made the 15 percent without counting those JSR leased employees because that is an agreement they didn't tell the Air Force about and they specifically concealed.").) The issue of whether NJM could use leased employees under agency rules and regulations to account for its portion of the work on the USAF contracts was critical to the case on the issue of the falsity and intent to make a false statement as to whether Medeiros controlled NJM, despite using leased employees from JSR to complete work on the projects. The Government has not shown that admission of the expert opinion of Patty Cullum was harmless. The jury likely considered the evidence and improperly weighed the evidence when evaluating whether Nick Medeiros controlled NJM at the time he certified NJM was a SDVOSB. Its admission was prejudicial to the defense and affected the fairness of the trial.

        **2) Prosecutor's closing arguments injected error in the trial by conflating separate elements for false statement prosecution into one element**

"Prosecutorial misconduct violates a defendant's due process rights if it infects a trial with unfairness and denies the defendant the right to a fair trial." *United States v. Currie*, 911 F.3d 1047, 1055 (10th Cir. 2018). When evaluating a claim of misconduct, a court must decide (1) whether the prosecutor's comment was improper in context, and (2) if it was, whether the comment deprived the defendant of a fair trial. *Id.* at 1055-56. The court must consider the trial as a whole, including the court's curative measures, the extent of the misconduct, and the role of the misconduct within the case. *Id.* at 1056. A jury is presumed to follow their instructions, even when a prosecutor makes a misleading argument. *Id.*

Defendants argue that a new trial is warranted because the prosecutor minimized the Government's burden of establishing materiality by telling jurors that any misstated or concealed fact would be material because the agency could use it to cancel a contract or program participation. John Klein had previously testified that "the mere fact that you submit false or incorrect information that we deem was intentional or we deem that was knowingly done, then that fact by itself would render you ineligible for the program even if the fact, if disclosed, would not have been a problem." (Tr. 852:5-10.) Defendants cite error in the portion of the prosecutor's closing argument in which he stated:

> You have testimony from Ben Ward and John Klein that say for, one, substantively these issues of control that are discussed in the letter, the nondisclosed sharing of personnel, equipment and facilities, the crucial financial support, the bonding, all of those things, substantively have the potential to drive the Government decision, which is the standard for materiality that Judge Herrera just read to us.
>
> Also Ben Ward and John Klein both said that any false statement from an applicant is grounds for mandatory cancellation under the regulations. That is not because Ben Ward is trying to be tough, it is mandatory under the regulations. *So there are two ways in which this statement was material, substantively the sharing matters and any false statement matters.*

(Tr. 1503:5-12 (emphasis added).) Defendants did not object to this portion of the Government's closing at trial, so the Court will review it for plain error.

The italicized portion of the prosecutor's closing argument was misleading. To impose criminal liability for a false statement requires that the fact itself is material – that the fact has a natural tendency to influence or is capable of influencing a decision by the agency. While any false statement to the agency would have rendered an individual ineligible for the program, not every false statement made to the agency is enough to constitute a crime. Thus, the Government's argument was wrong as it conflated the two elements, and it had the serious potential to confuse the jury that falsity alone met the materiality element. *Cf. United States v. Johnson*, 19 F.4th 248, 259 (3d Cir. 2021) ("Thus, to prove materiality, the government cannot simply present evidence that a statement was false and the information generally within the purview of the governmental decisionmaker to which it was addressed. Rather, it bears the burden of adducing testimony or other evidence explaining the purpose or use of the statement and some specific way or ways in which the statement might affect a particular decision of the decisionmaking body.").

A prosecutor "has a duty not to misrepresent the law." *Le v. Mullin*, 311 F.3d 1002, 1022 (10th Cir. 2002). *See also United States v. Currie*, 911 F.3d 1047, 1055 (10th Cir. 2018) ("[I]t is improper for the prosecution to misstate the law in its closing argument."). According to the United States, it did not misstate the law, but instead, argued how certain evidence met the Court's standard for materiality. But here, the evidence the Government pointed to was testimony by agency officials that any false statement mattered to them, and thus, the Government urged the jury that they could find the materiality element was met either because sharing mattered to the agency or because any false statement mattered. This latter argument had a strong likelihood of confusing the jury into believing that the materiality element could be satisfied in this case if the

jury found the Defendant made any false statement to the agency. Moreover, the Court's materiality instruction was not sufficiently curative where the Government made the misstatement in closing after referencing the Court's instruction in its argument on materiality. The suggestion that any falsity was material was not isolated. The Court thus finds that the statement was plainly improper.

### 3) Prosecutor's statements regarding Bobby Greaves' profit from alleged conspiracy were initially improper but do not amount to error

Another prosecutorial statement made in closing argument was improper. In closing, the Government suggested, without a basis in the evidence, that Bobby Greaves made a lot of money from the charged conspiracy: "Nick and Bobby relied on each other and they helped each other and they made a lot of money doing it. So much money that Bobby told you how he went from living in a doublewide trailer to pulling down a million dollars a year in JSR dividends." (Tr. 1499:23-1500:2.) The evidence, however, did not support an assertion that the charged criminal activity resulted in Bobby Greaves profiting in such large amounts, rather than from JSR's prior and other business activity. Defense counsel did not object to the statement. However, defense counsel later responded that it was not honest or proper for the Government to say that Bobby Greaves got into the position of making millions with JSR because of NJM when the Government knows "it is not true." (Tr. 1548:3-15.) In rebuttal, the Government stated, "So there was a false thing that was said during Mr. Greaves' closing, which is he claimed that I said Bobby Greaves only made millions because of NJM. But not only did I not say that, I don't think that is true and that is not what the evidence shows. The evidence shows that Bobby and Nancy Greaves made millions on Government contracts through Nancy Greaves' 8(a) status….But I never said that they

are millionaires now because of NJM. NJM didn't start until January of 2012." (Tr. 1602:21-1603:19.).

Personal attacks against defense counsel are prohibited. *Le*, 311 F.3d at 1021. Because counsel did not object to the statement during trial, the standard of review is for plain error. Mr. Gross's response was based on a reasonable interpretation of the Government's argument and the inferences to be made from it. The prosecutor juxtaposed the charged criminal acts with the money Bobby Greaves made beginning with an earlier timeframe than the charged conduct. Saying Mr. Gross said something false was disparaging, [7] but the Court is not convinced it amounts to plain error, or in isolation, affected Defendants' rights.

As to the Government's remarks about how much Bobby Greaves made from the charged criminal conduct, the Government's initial statement was misleading and not supported by the evidence. However, in rebuttal argument, the Government clarified its position, which as corrected, was supported by enough evidence to assert in closing. There was thus no error when the clarification is also considered.

### 4) Prosecutor's comments on his own questions and testifying as part of his question was error

Defendants assert as error a complaint the Court noted during trial. The prosecutor posed numerous long questions and long hypotheticals that called for yes or no answers, many of which were confusing and resulted in the prosecutor improperly testifying, rather than the witness. [8] The

---

[7] This was not the first time the Government made disparaging comments of defense counsel unnecessarily with a mocking tone. (*See* Tr. 694:13-15 (referencing defense counsel's hypothetical as "Bizarro Hasdorf and hypothetical Bizarro Convery").) While uncalled for, the Court does not find that the statement constituted error where the defense objected, and the Court sustained the objection after a bench conference in which the Court chastised counsel for his use of the insulting hypothetical. (*See* Tr. 694:13-697:2.)

[8] *See, e.g.*, Tr. 535:1-14 ("I want to show you 1L. It's already in evidence, and it is the request for consideration that Nick Medeiros sent to Ben Ward of CVE. And on the bottom of Page 2 and top of Page 3, one of the things he said in this letter is in a section entitled, 'Successful Contract Execution.' [H]e writes that he was the successful offeror for a Lackland Air Force Base project with sump pumps, which is Texas Contract Number FA304712 Tango 005. I just want to compare. This might be a different contract. It might be the same contract. Does the work order letter have

prosecutor also repeatedly made unnecessary comments about his own questions. (*See*, *e.g.*, Tr. 929:3-6 ("Well, the $51,000 was transferred to Nick and Janice Medeiros on May 2nd, 2012 and that is what documents in this case show. It's unconverted [sic] in this case as far as I can tell?"); Tr. 1133:14-15 ("This is not a trick question."); Tr. 1135:1 ("I am still not trying to trick you."); Tr. 1135:11-12 ("It wasn't a trick question…"); Tr. 1168:10 ("these aren't trick questions"); Tr. 1329:25-1330:1 ("I am not trying to ask a trick question."); Tr. 1174:19 ("Again, there are no trick questions."); Tr. 1183:16 ("Again, not a trick question."); Tr. 1273:9-10 ("Because I am not trying

---

the contract number, or should I go back to 2?"); Tr. 541:9-542:6 ("I want to move on to 3 Delta, which is the – entitled Quality Control Plan for the Weapons Cleaning Room Project, Cannon Air Force Base, New Mexico….So I see what looks like an organizational chart. It's entitled Figure 1. I see Corporate President Nick Medeiros at the top. And then I see Corporate Operation Quality Assurance Director is also Nick Medeiros. But then I see several other people listed. I see Ramon Rico over on the right. And there are arrows going back and forth directly between Nick Medeiros and Ramon Rico. I see arrows going directly back and forth between Nick Medeiros and Ricardo Martinez. I see arrows going one way to Janet Reader, arrows one way to Janet Reader, arrows one way to Jeremy Sullivan. Are any of those people, other than Nick Medeiros, employees of NJM at the time of the submission to the United States Air Force?"); Tr. 543:18-544:10 ("Next, I want to draw your attention to 3 Echo, which is entitled Subcontracting Documents. So I am looking at – Page 1 shows Nick Medeiros, himself. And it says, 'Date subcontract awarded, 1st of July 2013.' And he's awarding the subcontract to JSR. And then I look at Page 2. And it says in December of 2012, a subcontract is awarded to Nixon Construction. And then Page 3 shows December 2012, contract awarded to a refrigeration and heating company. And then Page 4, December 12 – 2012, a contract awarded to Norris & Son Electric. If I look through the rest of these pages, am I going to see more subcontracts being awarded in 2013 or only these December 2012s?"); Tr. 565:19-566:3 ("Moving on to Page 59. So at the top here, it says, 'Bobby Greaves Position and Business Concern, Other.' And we know from other documents that Nick Medeiros described him as a mere investor. And we see this chart says, zero hours per week devoted to business concern, business concern in this case being NJM. Did your review of the e-mails reveal that Bobby spent zero time and energy on NJM things?"); Tr. 896:15-897:8 ("So directing your attention to this document that is in evidence as 1P, this is a document that Nick Medeiros and Bobby Greaves signed. We are looking at Page 3 – and I can scroll down to the signatures here – and submitted to the VA specifically the CVE office and it says, 'We are located on the same property but do not share the facilities, equipment or employees,' and a parenthetical noting the service agreement that had been submitted to CVE. The facts in this case are that in truth and in fact, JSR employees and equipment worked on NJM jobs outside of the scope of the service agreement for administrative support and the leasing agreement for the leasing of an office trailer. Is there any regulation in which you can tell us that that word 'share' or the verb, 'to share' is a special defined term that wouldn't have its normal English meaning?"); Tr. 926:23-9 ("So I think what Mr. Garcia wrote in his letter is that he was sent, because of concerns about control, specifically that SDV Medeiros is a former employee of JSR and that just to paraphrase, it goes on there is a concern that JSR specifically has more control than you want or more undue influence than you might want. So if CVE – I am going to open up another document that is in evidence. If CVE learned that Bobby and Nancy Greaves who were the co-owners of JSR, Nancy 51 percent, she is 8(a); Bobby Greaves 49 percent, he is a white male. He is not 8(a) himself, took $110,000 out of JSR's operating account and then Bobby Greaves put in about $49,000 to become 49 percent owner of JSR [sic] and then what happened is that Bobby and Nancy Greaves split up the remaining $51,000 and change and Bobby and Nancy each gave a check to Nancy's parents, Joe and Madeline Felan, so four checks. And then Joe and Madeline Felan turned around and gave four checks, one each to Nick and Janice Medeiros and that is the money that Nick Medeiros used to buy his starting 51 percent share in NJM, would that be interesting to you?").

to trick you into answering lawyer talk."). *See also* Tr. 1602:12-13 ("I am not here to say anything mean about the defense attorneys.").) These comments describing his own questions and arguments and his long questions that amounted to testifying were improper.

### 5) Prosecutor's questions regarding Bronze Star did not amount to error

Defendants contend that the Government improperly asked questions about the reasons for which Defendant Medeiros was awarded the Bronze Star. Defense counsel on cross-examination elicited testimony about Defendant Medeiros serving in Iraq and receiving the Bronze Star. (*See* Tr. 360:16-361:3.) The Government on redirect examination asked questions about the basis for Defendant Medeiros receiving the Bronze Star. (*See* Tr. 392:21-395:25.) Defense counsel did not object to this questioning, so review is for plain error. Although the relevance of the questions was slight, the Court cannot find error in questions that explained the basis for which Defendant Medeiros received the award, an award that defense counsel brought up in cross-examination. The Government did not expressly disparage the award or Defendant's service. This line of questioning thus does not constitute error.

### 6) Prosecutor's questions and statements suggesting Nancy Greaves pretended to control JSR violated Rule 404(b)

Defendants argue that there was no legitimate basis for denigrating Nancy Greaves at trial. Defendants argue as error comments made by the Government in opening statements and closing arguments suggesting that Nancy Greaves did not run the company, as was required for JSR to qualify as an 8(a) program.[9] Defendants also point to error the following questions by the

---

[9] *See* Tr. 202:9-14, 203:10-16 ("And it was receiving that preferential treatment because on paper his wife, Nancy Greaves, was running the company and she was the owner of the company and as a Hispanic woman she did qualify for 8A, if she really was controlling the company…. And so Bobby Greaves, who actually ran JSR, had this difficulty. He could either compete fairly against all construction companies… or he could find someone else to pretend to run a company for his employees to use his equipment to perform on construction contracts."); Tr. 1618:6-20 ("[D]efense told you to be offended that I put on evidence that Nancy Greaves didn't really run the daily operations of JSR and he implied that the evidence wasn't real and that it was just me being mean. But I want to remind you that when Nick

Government: whether Nancy Greaves had a JSR office at the time of the search warrant (Tr. 294:6-7); whether there was a change in performance of JSR when Nancy Greaves stepped down from her title in JSR in 2016 (Tr. 398:8-399:10); and whether Nancy really ran JSR day-to-day (Tr. 701:1-702:16).

In response, the Government argued that "adducing testimony about how Bobby Greaves deceived the government into believing that Nancy Greaves ran JSR, Inc. when actually he did was important to establish his motive, intent, *modus operandi*, and lack of mistake as to the false statements he made as charged in this case." (Gov.'s Resp. 19, ECF No. 180.) The Government also noted, "The evidence at trial showed that Mr. Greaves made millions of dollars by falsely representing to the government that it was actually Nancy Greaves who ran JSR, when in truth and in fact it was he and Joe Felan. The jury was allowed to infer from that evidence that Mr. Greaves was aware of the potential to obtain and get paid for government contracts by making false statements to the government as to who would perform on any given government contract." (*Id.* at 21.) Defendants reply that the Government failed to file the required Rule 404(b) notice that it intended to attack the legality of JSR's 8(a) status by challenging Nancy Greaves' control of JSR.

Rule 404(b) prohibits the admission of evidence of any other crime, wrong, or act to prove a person's character to show that on a particular occasion the person acted in accordance with the character, unless the evidence is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. Fed. R. Evid. 404(b)(1)-(2). In a criminal case, the prosecutor must in writing before trial provide reasonable notice of any such

---

Medeiros testified, he said that he went to JSR to watch how Bobby ran the show. That is not from me. Nick Medeiros said that he went to learn from Bobby, how Bobby ran the show. Nancy Greaves isn't on trial here. But Bobby's need to use special access programs to get sole source direct award contracts so that he wouldn't have to compete on the open market is part of this trial. I did not put on that evidence to be mean to Nancy Greaves. This trial is not about her, it is about Bobby Greaves' motivation, his agreement with Nick Medeiros…so that they could keep getting those contracts.").

evidence so that the defendant has a fair chance to contest it. Fed. R. Evid. 404(b)(3). To determine if the Rule 404(b) evidence should be admitted, the evidence must be offered for a proper purpose, it must be relevant, its probative value must not be substantially outweighed by its potential for unfair prejudice, and, upon request, the court should instruct the jury to consider the evidence only for the purpose for which it was admitted. *United States v. Henthorn*, 864 F.3d 1241, 1247-48 (10th Cir. 2017).

Here, the Government did not submit a Rule 404(b) notice as to Bobby Greaves that it planned to introduce evidence that Nancy Greaves did not in actuality control and run JSR. The defense, however, did not object to the questions or answers at trial, so the Court considers the alleged error on plain error review.

As an initial matter, the Court finds error in the admission of this argument and testimony because it violated Rule 404(b). The Government argues that the evidence is not "other-act" evidence, but rather direct evidence of Bobby Greaves' intent during the charged time period. Other-act evidence is intrinsic "when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Lambert*, 995 F.2d 1006, 1007 (10th Cir. 1993). In other words, "intrinsic evidence is directly connected to the factual circumstances of the crime[.]" *United States v. Parker*, 553 F.3d 1309, 1314 (10th Cir. 2009) (internal quotation marks omitted). Even intrinsic other-act evidence, although not excluded by 404(b), is still subject to Rule 403's requirement that its probative value is not substantially outweighed by the danger of unfair prejudice. *Lambert*, 995 F.2d at 1007–08.

This Court is not convinced that the evidence related to Bobby Greaves' intent to deceive the Government concerning his wife's control of JSR to gain 8(a) status is intrinsic to the charged

crimes. How JSR obtained its 8(a) status through Nancy Greaves is not inextricably intertwined with the conspiracy to defraud the government arising from NJM's SDVOSB status.

The Government also asserts that it gave the requisite notice in the Superseding Indictment by alleging that JSR was owned 51% by Nancy Greaves and describing numerous overt acts performed by Bobby Greaves to control and direct JSR assets. Again, the Court is not persuaded that the Superseding Indictment would lead a reasonable person to understand that the Government was alleging that Nancy Greaves was merely pretending to run JSR to gain 8(a) status for JSR.

While the evidence was offered to prove motive, a proper purpose, the probative value of the evidence was substantially outweighed by its potential for unfair prejudice. The motive evidence the Government sought would have been proper if it was limited to the fact that JSR was graduating from its 8(a) status, so Bobby Greaves sought other ways to bid on sole-source direct award contracts. But, the Government insinuated more. It introduced evidence and argument that Nancy Greaves was pretending to have the requisite control over JSR, and that Bobby Greaves and his wife made prior false representations to federal agencies. That is clearly Rule 404(b)(1) evidence. The prejudice of that evidence substantially outweighed its relevance and would have required a mini trial to prove or disprove the assertions. The Court erred in permitting the argument and evidence to be introduced. The Court need not determine whether the introduction of that evidence, alone, amounted to plain error, because as discussed *infra*, the cumulative impact of all the errors at trial, including the Rule 404(b) error of admission, warrants a new trial.

### 7) Prosecutor's question that assumed Defendant submitted false evidence was improper

Next, Defendants claim error as to a specific question that assumed guilt. During trial, the Government asked CVE inspector David Williams, "When Nick Medeiros told you that he was glad that he had CVE certification, would it have been interesting to you to learn that he had

submitted false information to CVE to persuade them to give him that certification?" (Tr. 494:20-24.) Assuming Defendants' guilt for one of the crimes for which the jury must decide their guilt or innocence, is an improper question. *Cf. United States v. Polsinelli*, 649 F.2d 793, 795-98 (10th Cir. 1981) (concluding government committed error in asking question of character witness that assumed as a fact that the defendant was guilty of the very crimes for which a jury had been impaneled to decide his guilt or innocence). The question assumed as a fact that Nick Medeiros submitted false information to a government agency to persuade it to certify NJM – the very question for the jury. The Court finds this question to be improper and with the potential to prejudice the jury.

### 8) Admission of evidence of omissions for which there was no duty to disclose may have confused jury and should not have been admitted

Defendants also contend that the prosecution in its questioning and in its closing argument improperly faulted Defendants for having concealed facts they had no duty to disclose. If the government charges a section 1001 violation based on a theory of concealment or nondisclosure of material facts, the Government must "prove that the defendant had the duty to disclose the material facts at the time he was alleged to have concealed them." *United States v. Irwin*, 654 F.2d 671, 678 (10th Cir. 1981), *overruled on other grounds by United States v. Daily*, 921 F.2d 994, 1005 (1990).[10] The Government relied on affirmative false statements in its section 1001 counts. Although the Government did not charge a concealment theory in its section 1001 counts, it used the concealment evidence to support its conspiracy charge. The repeated references to facts that

---

[10] *See also United States v. Safavian*, 528 F.3d 957, 964 (D.C. Cir. 2008) ("Concealment cases in this circuit and others have found a duty to disclose material facts on the basis of specific requirements for disclosure of specific information….There is good reason for demanding such specificity: to comply with Fifth Amendment due process, the defendant must have "fair notice ... of what conduct is forbidden.... [T]his 'fair warning' requirement prohibits application of a criminal statute to a defendant unless it was reasonably clear at the time of the alleged action that defendants' actions were criminal.") (quoting *United States v. Kanchanalak*, 192 F.3d 1037, 1046 (D.C. Cir. 1999)).

Defendants did not disclose, when the Government did not establish that there was a legal duty to disclose the same facts to the particular person or entity to which the question was directed, resulted in the introduction of irrelevant evidence that likely confused and prejudiced the jury. It was error to admit such evidence.

For example, the Government asked Agent Siegfried whether Nick Medeiros disclosed in a letter to Ben Ward that the subcontract work for a Lackland Air Force base sump pump project went to JSR. (Tr. 533:3-536:8.) Defendant Medeiros, however, discussed the project in a portion of the letter describing his successful contract execution and how he managed the project and completed administrative tasks related to subcontractor coordination. (*See* Gov.'s Ex. 1l at 2-3.) The Government did not establish any duty on the part of Defendant Medeiros to disclose the subcontractors in that letter, so the relevance of the lack of disclosure in that letter might have misled the jury into assigning criminal intent to an omission where no duty existed to disclose the information in the first place.

By way of another example, in its closing argument for Count 2, major fraud, the Government argued that the jury should consider evidence from which inferences could be drawn that Nick Medeiros did not exclusively control NJM, pointing to truths that Defendants concealed from the Government. (Tr. 1521:3-1522:12.) One such concealment that the Government urged the jury to consider was that Defendants kept from the Air Force that NJM's bonding was reliant on JSR backing the bonding. (Tr. 1527:14-1528:12.) The Government asked repeatedly of witnesses whether Defendants disclosed to the Air Force that NJM only got bonding because of corporate support by JSR. (*See* Tr. 1117:3-1118:15, 1344:6-10.) While the evidence regarding the bonding was relevant to the issue of Nick Medeiros' control of NJM and Bobbie Greaves' influence over NJM, the Government painted the failure to disclose the bonding to the Air Force

as evidence of criminal conduct. (*See* Tr. 1525:2-7 ("But he chose to do [the contracts] in a way that was a crime because it concealed the truth from the Air Force about the interaction between NJM and JSR, just like the Court read to you from the superceding indictment.")). The Government, however, never established that the USAF asked a question of NJM regarding bonding indemnification or that there was a regulation creating a duty for NJM to disclose that fact. Instead, the Government's witness from the USAF, Ms. Short, testified that the USAF does not ask for the general indemnity agreements. (Tr. 810:3-17.)[11]

Similarly, the prosecutor asked questions of Ms. Connally about whether Defendants disclosed to the USAF that when NJM was running low on operating funds, it would ask JSR for funds, which JSR would provide. (*See* Tr. 1118:21-1119:7.) The Government's questions suggested criminal intent without establishing that there was a duty to disclose such information to the USAF.

These repeated references to concealed facts from the USAF, without supporting facts that showed a duty to disclose those facts, had the potential to mislead the jury and cause them to improperly weigh the evidence. The evidence had little probative value but a high likelihood to confuse the issues, given the multiple agencies and documents involved.

### 9) Repeated pejorative phrase "shuffle" was improper insinuation

Defendants claim error in the repeated questions by the Government that used derogatory phrases for actions that the evidence showed were themselves legal. For example, Michael Lombard testified that the structuring technique used by Defendants to avoid gift taxes was a fraud indicator, although the structuring did not violate any tax law. (Tr. 289:12-290:12.) Despite the

---

[11] Evidence in the record indicated that Defendants had a duty to disclose third-party indemnification on corporate bonds to the SBA, (*see* Gov.'s Ex. 5A at 29), but the Government did not show that the USAF asked a similar question that Defendants had a duty to answer.

legality of that action, the Government repeatedly referred to it as a "shuffle," suggesting a bad act inherent in the structuring. (*See*, *e.g.*, Tr. 290:16, 301:8, 303:14, 316:12, 569:16.)[12] Prosecutors should not make improper insinuations or suggestions calculated to mislead a jury. *See Berger v. United States*, 295 U.S. 78, 85, 88 (1935). The Court is concerned that the repeated negative descriptors for legal gifting could taint the jury's consideration of whether Defendants unlawfully concealed the origins of the NJM's startup funding when considering the conspiracy charge. While this error is not sufficient to have influenced the jury, alone, the Court will consider its effect in its cumulative error analysis.

### 10) Wire-fraud conspiracy instruction was erroneous

In addition, Defendants claim error in the conviction on Count 1 because the jury was erroneously instructed. Here, the Government charged in Count 1 as one of the alleged agreements to violate the law, an agreement to commit wire fraud. The Court gave a wire fraud instruction submitted by the United States with the elements of the crime without objection by the defense. (*See* Court's Instruction No. 6A, ECF No. 166 at 13; Defs.' Mot. for New Trial 22, ECF No. 177.) In defining a "scheme to defraud," the instruction said it "includes a scheme to deprive another of money, property or the intangible right of honest services." (Court's Instruction No. 6A, ECF No. 166 at 13.) Relying on *Skilling v. United States*, 561 U.S. 358 (2010), the defense argues this instruction was plain error because honest services fraud must be limited to bribery or kickback schemes. Defendants argue this instruction was prejudicial because the Government's theory was an "honest services" fraud, given that this was not a take-the-money-and-run case.

---

[12] Defense counsel objected to the following statement by the prosecutor on grounds of the prosecutor testifying and leading the witness in a prejudicial way: "Does he disclose the way that he was shuffled $51,000 through JSR's operating account to Bobby and Nancy Greaves to Joe and Madeline Felan to him and his wife?" (Tr. 569:15-21.) The Court sustained the leading, but when asked for an instruction that the prosecutor's testimony is not evidence, the Court denied the request because it had already instructed the jury that questions are not evidence. (Tr. 569:19-570:11.) Because this error was objected to, the Court's review is de novo.

In *Skilling*, the defendant was charged, among other things, with conspiracy to commit securities and wire fraud by depriving the company and its shareholders of the intangible right of his honest services. 561 U.S. at 369 & n.1. The defendant argued that his conspiracy conviction must be overturned, because it was premised on the theory of honest-services wire fraud, which as defined by 18 U.S.C. § 1346 (the honest-services statute), was unconstitutionally vague. *Id.* at 399. Section 1346 defined the term "scheme or artifice to defraud" to include depriving another of "the intangible right of honest services." *Id.* at 369 n.1. The Supreme Court held that the phrase "the intangible right of honest services" must be confined to "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived" to avoid constitutional vagueness problems. *Id.* at 404. Because the evidence did not support such a revised theory against the defendant, the Court concluded that the defendant did not commit honest-services fraud. *See id.* at 413. It then explained that, because the indictment alleged three objects of the conspiracy, including honest-service wire fraud, the conviction was flawed, but that such an error was entitled to harmless-error analysis. *Id.* at 413-14.

As an initial matter, the Government argues that Defendants waived the argument, with no rights to review, because they challenged some jury instructions, but not Instruction 6A. The intentional relinquishment or abandonment of a known right constitutes waiver in which a party is not entitled to appellate relief. *Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 991 (10th Cir. 2019). When an appellant raises an issue on appeal that simply was not raised before the district court, an appellate court will consider the issue but will only reverse if failing to do so would entrench a plainly erroneous result. *Id.* The Court is not convinced that Defendants intentionally waived a challenge to Instruction 6A. Under Rule 52(b), a court may consider a plain error that affects substantial rights "even though it was not brought to the court's attention." Fed.

R. Crim. P. 52(b). A court, however, must disregard an error that "does not affect substantial rights." Fed. R. Crim. P. 52(a).

"When reviewing a claim of error relating to jury instructions, the instructions must be read and evaluated in their entirety" to "determine whether the instructions, examined in the light of the record as a whole, fairly, adequately, and correctly state the governing law and provide the jury with an ample understanding of the applicable principles of law and factual issues confronting them." *United States v. Denny*, 939 F.2d 1449, 1454 (10th Cir. 1991). Instruction 6A erroneously defined "scheme to defraud" to include "the intangible right of honest services" in the wire fraud instruction without limiting such a theory to bribery and kickback schemes. This case did not involve bribery or kickback schemes and should not have included an honest services theory in that instruction. Read as a whole, the instructions did not accurately state the governing law as to the limitations of a scheme to defraud based on an honest-services theory. Based on *Skilling*, the Court finds the instruction constituted clear error, and was thus "plain." Consequently, the Court must determine whether it affected Defendants' substantial rights.

Reversal is warranted only if an error in jury instructions is prejudicial in light of the entire record. *Denny*, 939 F.2d at 1454. A court "will uphold a guilty verdict following an erroneous instruction if 'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *United States v. Smith*, 534 F.3d 1211, 1220 (10th Cir. 2008) (quoting *United States v. Luke-Sanchez*, 483 F.3d 703, 705 (10th Cir. 2007)). Even if the instruction was erroneous, the Government contends it did not affect the verdict because it did not charge Defendants with depriving anyone of their honest services. The Government's conspiracy theory was that Defendants made fraudulent representations and omissions to gain valuable SDVOSB contracts to which NJM was not entitled. As charged, and as argued by the Government, the

conspiracy to commit wire fraud was based on money transfers based on USAF payments on the contracts NJM was awarded. (*See* Tr. 1532:1-1533:7.) However, as to the wire-fraud conspiracy charge, the "scheme to defraud" was defined as depriving "another of money, property or the intangible right of honest services." This case was not about taking the Government's money and not performing the services. While money transfers were involved, the way the wire-fraud conspiracy charge was instructed could have caused the jury to believe that they could convict based on Defendants' depriving the United States of "honest services." The Government invoked the theme of honesty in its closing when it said, "It doesn't matter if you could have gotten the contract honestly if you had tried honestly." (Tr. 1616:2-4.) The Court is left with a grave doubt as to whether the jury came to its verdict on the wire-fraud conspiracy theory based on the erroneous instruction. The Court therefore finds that plain error occurred and will vacate the jury's finding in the Verdict on the conspiracy based on wire fraud.

Even finding a plainly prejudicial error on the wire-fraud conspiracy, that does not end the Court's analysis for Count 1 because the jury in its Verdict found the Government proved three other types of agreements to violate the law. While the instruction error, alone, does not warrant a new trial on the conspiracy charge based on the remaining unlawful agreements, for the reasons given below the Court finds the error, when viewed cumulatively, added to prejudicial error warranting a new trial.

### b. Cumulative Errors Affected Jury Verdict

The Court next examines the likely effect of the errors and improper comments on the jury's verdict, weighing errors and improper comments against the strength of the evidence against the defendant. *See United States v. Christy*, 916 F.3d 814, 824 (10th Cir. 2019). This was a complex case involving many agencies and documents. For the reasons discussed above, the evidence of

61

criminal intent, materiality, and falsity was close, and the defense presented a credible, strong case for reliance on the advice of counsel. The multiple errors in admission of evidence, in instructions, and in prejudicial statements by counsel, together had the serious potential to confuse the jury and affected the fairness of the trial. The repeated questions on omissions for which there was no duty to report, and characterization of lawful conduct as bad acts risked the jurors attributing a higher level of culpability to Defendants than was actually present. This risk was compounded by errors in instruction on Count 1 and the prosecutor potentially confusing the jury on the key element of materiality. Notably, despite the voluminous pages of exhibits, the jury took less than three hours to decide this case. On cumulative error review, the Court finds that errors in the trial, viewed in the aggregate, seriously affected the fairness of the trial as to all counts and warrant a new trial.

**IT IS THEREFORE ORDERED** that Defendants' *Renewed Motion for Judgment of Acquittal* (**ECF No. 176**) is **GRANTED IN PART AND DENIED IN PART** as follows: Defendants' request for judgment of acquittal is **GRANTED** as to **Counts 2, 3, and 4**, but the request is **DENIED** as to **Count 1**. Defendants' *Motion for New Trial* (**ECF No. 177**) is **GRANTED**.

**SENIOR UNITED STATES DISTRICT JUDGE**